Justin M. Brandt (SBN: 031573)
**ROSE LAW GROUP pc**
7144 East Stetson Drive, Suite 300
Scottsdale, Arizona 85251
Tel: (480) 505-3936
Fax: (480) 505-3925
docket@roselawgroup.com
jbrandt@roselawgroup.com
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| N2 PACKAGING SYSTEMS, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>N2 PACK CANADA, INC., an un-incorporated fictious entity; ERIC MARCINIAK, individually; BRENDAN POGUE, individually; ALEJO ABELLAN aka ALEX ABELLAN, individually; CHAKRA CANNABIS CORP., a Canadian federal corporation; and DOES 1-10, inclusive,<br><br>Defendants. | No. 2:19-cv-02351-NVW<br><br>**VERIFIED**<br>**FIRST AMENDED COMPLAINT** |

Plaintiff N2 Packaging Systems, LLC ("Plaintiff" or "N2 Packaging"), for its Verified First Amended Complaint ("Complaint") against Defendants N2 Pack Canada, Inc., Eric Marciniak, Brendan Pogue, Alejo Abellan aka Alex Abellan, Chakra Cannabis Corp., and DOES 1-10 (collectively, "Defendants") alleges as follows:

### Parties and Jurisdiction

1.      N2 Packaging is and was at all relevant times an Arizona limited liability company, in good standing, authorized to do business, and doing business in Maricopa County, Arizona.

2.      Upon information and belief, N2 Pack Canada, Inc. ("N2 Canada") is and was at

*Rose Law Group pc*
*7144 E. Stetson Drive, Suite 300*
*Scottsdale, AZ 85251*

all relevant times an un-incorporated fictitious entity doing business in British Columbia, Canada, under the un-registered fictitious entity name N2 Pack Canada, Inc.

3.      Upon information and belief, Eric Marciniak ("Marciniak") is a real individual residing in British Columbia, Canada.

4.      Upon information and belief, Brendan Pogue ("Pogue") is a real individual residing in British Columbia, Canada.

5.      Upon information and belief, Alejo Abellan aka Alex Abellan ("Abellan") is a real individual residing in British Columbia, Canada.

6.      Upon information and belief, Marciniak, Pogue, and/or Abellan are purported principal officers and/or shareholders of the un-incorporated fictitious entity N2 Canada (collectively, "N2 Canada Principals").

7.      Upon information and belief, Chakra Cannabis Corp. ("Chakra") is and was at all relevant times a duly formed Canadian federal corporation, authorized to do business, and doing business in British Columbia, Canada.

8.      Upon information and belief, Abellan is also a principal officer and/or shareholder of Chakra.

9.      Plaintiff does not know the true names of Defendants sued herein as DOES 1 through 10. DOES 1 through 10 are persons, partnerships, corporations and/or associations subject to suit in a common name whose true identities are unknown and who may be responsible, in whole or in part, for the events and happenings referred to herein and legally caused the damages alleged by Plaintiff in this Complaint. Plaintiff will seek to amend this Complaint to set forth the true names and capacities of any of the DOE Defendants when their identities become known to Plaintiff.

10.     The N2 Canada Supply Agreement (defined below) between N2 Packaging and N2 Canada mandates that "[a]ny and all claims, questions or disputes regarding the interpretation, performance and enforceability of this Agreement, the rights and remedies of

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

(Page 2)

the Parties hereunder, and all related actions or counterclaims shall be initiated and prosecuted in the courts of the state of Arizona located in Phoenix, Maricopa County, Arizona."

11.     N2 Packaging's claims against N2 Canada and the N2 Canada Principals (collectively, "N2 Canada Defendants") arise out of N2 Canada's breach of its obligations under the N2 Canada Supply Agreement, the N2 Canada Principals' actions that caused the same, and N2 Packaging's enforcement of its rights under the N2 Canada Supply Agreement in response to the same.

12.     Further, the IC Agreement (defined below) between N2 Packaging and Abellan mandates that "[a]ny and all claims, questions or disputes regarding the interpretation, performance, and enforceability of this Agreement, the rights and remedies of the parties hereunder, and all related actions or counterclaims shall be initiated and prosecuted in the courts of the state of Arizona located in Phoenix, Maricopa County, Arizona."

13.     N2 Packaging's separate claims against Abellan arise out of Abellan's breach of his obligations under the IC Agreement, Abellan's interference with the N2 Canada Defendants' obligations under the N2 Canada Supply Agreement, Abellan's interference with Chakra's obligations under the Chakra Supply Agreement, and N2 Packaging's enforcement of its rights under the IC Agreement, N2 Canada Supply Agreement and Chakra Supply Agreement in response to the same.

14.     Moreover, the Chakra Supply Agreement (defined below) between N2 Packaging and Chakra mandates that "[a]ny and all claims, questions or disputes regarding the interpretation, performance, and enforceability of this Agreement, the rights and remedies of the parties hereunder, and all related actions or counterclaims shall be initiated and prosecuted in the courts of the state of Arizona located in Phoenix, Maricopa County, Arizona."

15.     N2 Packaging's separate claims against Chakra and Abellan, in his capacity as director and/or shareholder of Chakra (collectively, "Chakra Defendants") arise out of Chakra's breach of its obligations under the Chakra Supply Agreement, Abellan's actions as Chakra's

principal officer and/or shareholder that caused the same, and N2 Packaging's enforcement of its rights under the Chakra Supply Agreement in response to the same.

16.     The Superior Court of Arizona, Maricopa County, in Phoenix, has personal jurisdiction over the Parties in this lawsuit.

17.     The Superior Court of Arizona, Maricopa County, in Phoenix, is the exclusive and proper venue for this action pursuant to the N2 Canada Supply Agreement, the IC Agreement and the Chakra Agreement.

18.     The Superior Court of Arizona, Maricopa County, in Phoenix, has jurisdiction over the subject matter of this action pursuant to Article VI, § 14 of the Arizona Constitution and A.R.S. § 12-401.

19.     Pursuant to Ariz. R. Civ. P. 26.2(b), (c), the complexity of Plaintiff's claims and the monetary damages as alleged herein qualifies this case for assignment to Tier 2 and standard discovery.  If Defendants continue to breach and/or cause N2 Canada and/or Chakra to breach their obligations to protect N2 Packaging's Intellectual Property (defined below) as described herein, however, the ongoing and accruing nature of Plaintiff's claims and damages may qualify this action for discovery as described for Tier 3.

## Factual Allegations Relevant to All Claims

### Plaintiff's Intellectual Property & Confidential Information

20.     N2 Packaging is in the business of offering innovative packaging solutions for companies that handle and/or engage in the distribution of certain controlled substances in Arizona, the United States and internationally, pursuant to and in compliance with applicable laws, regulations and requirements.

21.     As a part of its business, N2 Packaging developed a proprietary nitrogen-based packaging process for canning a controlled substance using a hermetically sealed lined container with a modified atmosphere that greatly extends the shelf life of any contents (the "Proprietary Process").

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

22.     N2 Packaging's Proprietary Process involves using a modified seamer that hermetically seals each can after it's flushed with liquid nitrogen with an easy to open pop-top life to create an air-tight and completely odorless package.

23.     As early as 2011, N2 Packaging has filed certain patent applications with the United States Patents and Trademarks Office ("USPTO") in protection of its Proprietary Process.

24.     On September 15, 2011, N2 Packaging filed a patent application with USPTO for the process of "Storage Preservation and Transport for a Controlled Substance," patent application number: 13/233,931 ("Storage Patent"), USPTO Patent No. 8,863,947 B2.

25.     The Storage Patent's application contains the following description:

> "The present application provides a unique process of canning a controlled substance where the cans are hermetically sealed and clearly identified in a number of different ways.  The process will begin by inserting a packing and dehumidifying agent, preferably a formed rice cake.  The controlled substance is then inserted.  In some cases, the rice cakes will be eliminated or just a single rice cake will be used on the top or the bottom.  If the process of storing the controlled substance in an inert atmosphere is desired, the oxygen in the container is replaced with gaseous nitrogen.  After the container has been sealed in the conventional pop-top canning procedure, an identifying scent substance is permanently adhered to the can or label. An internal or external microchip could be used to detect, track and trace the container filled with a controlled substance."

26.     On October 21, 2014, USPTO approved N2 Packaging's Storage Patent application and published the Storage Patent on the same date, attached hereto as "**Exhibit A**."

27.     On October 20, 2014, N2 Packaging filed a patent application with USPTO for a "Container for the Storage, Preservation, Identification, Tracking and Transport of a Federally Controlled Substance," patent application number: 14/519,031 ("Container Patent"), which is used as part of the process described in the Storage Patent.

28.     The Container Patent's application contains the following description:

> "The present application provides a container for storage, preservation, identification, tracking and transport of a federally controlled substance comprising: (a) a one or more piece airtight container having an exterior surface and an interior surface, an upper

portion and a lower portion, configured for containing a federally controlled substance; (b) an inner coating liner lining said interior surface of said airtight container; (c) a one piece tamper resistant easy open lid affixed to said upper portion of said airtight container; and (d) identifying indicia located on the exterior surface for identifying the contained federally controlled substance contents within said container; wherein said airtight container configured for containing a federally controlled substance, has the atmosphere evacuated and the container filled with an inert gas before the airtight container is hermetically sealed, containing a federally controlled substance inside."

29.     On January 30, 2018, USPTO approved N2 Packaging's Container Patent application and published the Container Patent on the same date, USPTO Patent No. 9,878, 821 B2, attached hereto as "**Exhibit B**."

30.     On June 07, 2017, N2 Packaging filed a patent application with USPTO for a "Child Resistant and Senior Friendly Can Lid," patent application number: 15/616,483 ("Lid Patent"), attached hereto as "**Exhibit C**," which is used as a part of the processes described in the Storage Patent and Container Patent.

31.     The Lid Patent's application contains the following description:

"The present invention is directed to a can lid that is child resistant, and at the same time senior friendly, and can be initially installed on a can to be removed by an adult, especially a senior adult, and be put back on the can in the same condition where a child could not be able to easily remove it.  The child resistant and senior friendly can lid provided has a replaceable can lid and a locking member, such that when a can is initially opened, it may be readily resealed.  The child resistant and senior friendly can lid has tapered, smooth sides to make the lid difficult to grasp and a sealing ledge on the inside surface to grab the seam roll of the upper edge of the can.  The lid sealing ledge is relieved in two areas ninety degrees apart leaving a ridge to maintain a seal when the lid is attached to a can.  The can lid will be flexible enough to bend for removal by seniors but resistant to removal by children."

32.     The Lid Patent application is still pending with USPTO, USPTO Publication No. US-2017-0355-495-A1.

33.     On January 29, 2018, N2 Packaging filed a patent application with USPTO for a "Re-Sealable Container for a Controlled Substance having a Child Resistant Lid," patent application number: 15/882,962 ("Re-Sealable Container Patent"), which is used as a part of

the processes described in the Storage Patent, Container Patent and Lid Patent.

34.     The Re-Sealable Container Patent contains the following description:

"Provided is a re-sealable container for storing, preserving, identifying tracking and transporting a federally controlled substance having a child resistant and senior friendly lid, and a process for identifying and tracking federally controlled substances within the re-sealable containers.  The re-sealable federally controlled substance containers include a two-piece child resistant and senior friendly lid and a 2-factor authentication identification tag, as well as a microchip for identifying the container controlled substance contents and tracking the container.  Controlled substance contents within the re-sealable containers are optimized for long term storage by removal of the oxygen therein, and the containers and controlled substance contents can be readily identified, detected tracked and traced after being filled with a federally controlled substance."

35.     On November 13, 2018, USPTO approved N2 Packaging's Re-Sealable Patent application and published the Re-Sealable Patent on the same date, USPTO Patent No. 10,124,941 B2, attached hereto as "**Exhibit D**."

36.     As early as 2015, N2 Packaging has filed certain international patent applications in protection of N2 Packaging's intellectual property with the World Intellectual Property Organization ("WIPO"), pursuant to the 1970 Patent Cooperation Treaty ("PCT"), as amended from time to time, of which the United States and Canada are signatories.

37.     On October 19, 2015, N2 Packaging filed an international patent application with WIPO for a "Container for Federally Controlled Substance," WIPO patent application number: PCT/US2015/05618 ("International Container Patent"),[1] which encompasses processes described in N2 Packaging's Storage Patent, Container Patent, Lid Patent and Re-Sealable Container Patent.

38.     The International Container Patent's application contains the following description:

"This application provides a unique container for storage, preserving, identifying, tracking and transporting a federally controlled substance and a canning process for federally controlled substances where the cans

---

[1] The Storage Patent, Container Patent, Lid Patent, Re-Sealable Container Patent and International Container Patent are collectively referred to herein as "N2 Packaging's Intellectual Property".

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

enamel lined, atmosphere evacuated, inert gas filled, and hermetically sealed, and the federally controlled substance are cleared identified in a number of ways. In particular, the federally controlled substance containers are optimized for long term storage and can be readily detected, tracked and traced when filled with a federally controlled substance."

39. On May 06, 2016, the WIPO published the International Container Patent internationally, WIPO International Publication No. WO 2016/069304 A1, attached hereto as "**Exhibit E**."

40. N2 Packaging's Proprietary Process that it markets and sells to companies in the business of handling or distributing certain controlled substances is premised on, comprised of and/or utilizes N2 Packaging's Intellectual Property.

41. N2 Packaging promotes and sells packaging systems that utilize the Proprietary Process and N2 Packaging's Intellectual Property in a brick-and-mortar store in Twin Falls, Idaho, and through an online presence.

42. N2 Packaging's Proprietary Process has been featured on various media outlets, including NBC News, GIZMODO and other prominent news outlets.

43. N2 Packaging expended significant resources in designing, developing and refining N2 Packaging's Intellectual Property and Proprietary Process, including hiring a testing company to perform a 12-month independent lab case study on the efficacy and performance of N2 Packaging's Intellectual Property and Proprietary Process.

44. As described in greater detail below, the Defendants connived, conspired, conducted, participated and/or otherwise engaged in a nefarious scheme to misappropriate and infringe upon N2 Packaging's Intellectual Property and Proprietary Process in Arizona, the United States and elsewhere, without N2 Packaging's express knowledge, permission or authorization, for the Defendants' pecuniary gain and to the detriment and harm of N2 Packaging.

**The Business Venture in Canada**

45. N2 Packaging markets its Proprietary Process that utilizes N2 Packaging's

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

Intellectual Property not only to companies in the United States but also to international clients.

46.    In an effort to expand its business in North America, N2 Packaging's directors made a business decision to partner with Canadian business partners or a Canadian entity to promote and sell packaging systems utilizing it's Proprietary Process in Canada.

47.    On or about early 2017, N2 Packaging's principals engaged in negotiations with Abellan to discuss the possibility of entering into a business venture in Canada, whereby Abellan would be granted a limited license to market and sell packaging systems utilizing N2 Packaging's Proprietary Process in Canada on N2 Packaging's behalf.

48.    During Abellan's negotiations with N2 Packaging, he represented to N2 Packaging and its principals that he had the necessary business knowledge and connections in Canada to bring N2 Packaging's desired expansion into fruition.    Additionally, Abellan materially represented to N2 Packaging that he can help N2 Packaging expand into Canada while ensuring that N2 Packaging's Intellectual Property is duly protected from unlawful infringement.    In reliance on Abellan's representations, N2 Packaging entered into an Independent Contractor Agreement, dated March 28, 2017, with Abellan (the "IC Agreement"), attached hereto as "**Exhibit I**" to initiate N2 Packaging's expansion plans.

49.    However, unbeknownst to N2 Packaging, but known to Abellan, Abellan's material representations to N2 Packaging regarding protecting N2 Packaging's Intellectual Property during their business venture in Canada was nothing more than a ruse to induce N2 Packaging into entering the IC Agreement (and, other agreements) in order to gain unlawful access to N2 Packaging's Intellectual Property and misappropriate N2 Packaging's Proprietary Process for his personal gain.

50.    Sometime after the IC Agreement was entered, Abellan communicated to N2 Packaging that it's business objectives would be better served by entering into an exclusive distribution agreement with his company Chakra, which purportedly had the capacity to handle greater sales volumes through trusted distribution networks.    Abellan also re-affirmed and

materially represented to N2 Packaging that it's Intellectual Property would be protected in the business venture with Chakra.

51.     In reliance on Abellan's past and new representations regarding the purported benefits of entering into an exclusive distribution agreement with Chakra, N2 Packaging entered into an exclusive Packaging Supply Agreement, dated June 27, 2017, with Chakra (the "Chakra Supply Agreement"), attached hereto as "**Exhibit J**" to grant Chakra a limited license to market and sell packaging systems utilizing N2 Packaging's Proprietary Process in Canada on N2 Packaging's behalf.

52.     However, unbeknownst to N2 Packaging, but known to the Abellan, Abellan continued to make material representations to N2 Packaging regarding protecting N2 Packaging's Intellectual Property—promises, that Abellan never intended to keep to keep—in order to induce N2 Packaging into entering the Chakra Supply Agreement so as to allow Abellan to have greater access to N2 Packaging's Intellectual Property for unlawful misappropriation.

53.     Pursuant to the Chakra Supply Agreement, N2 Packaging provided Chakra limited access to certain confidential and proprietary information regarding N2 Packaging's Intellectual Property and Proprietary Process, as well as a limited license to utilize N2 Packaging's Intellectual Property and Proprietary process to effectuate the purpose of the Chakra Supply Agreement and subject to the terms and restrictions thereof.

54.     N2 Packaging retained sole and exclusive ownership interest and rights in the Chakra Supply Agreement over N2 Packaging's Intellectual Property and Proprietary Process.

55.     Chakra obtained no ownership interest or rights over N2 Packaging's Intellectual Property and Proprietary Process pursuant to the Chakra Supply Agreement or the limited license conferred therein.

### The N2 Canada Supply Agreement

56.     Sometime after the Chakra Supply Agreement was entered, Abellan

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

communicated with and pitched to N2 Packaging that while Chakra can help N2 Packaging enter the Canadian market, N2 Packaging's business interests would be better served by partnering with to-be-formed Canadian entity that would share N2 Packaging's brand.

57.     In doing so, Abellan materially represented to N2 Packaging that it's Intellectual Property would be better protected as the products being distributed in Canada would bear N2 Packaging's logo, which, in correlation, would also to enhance and protect N2 Packaging's brand as consumers and industry members will be cognizant of the true origination of the Proprietary Processes being distributed by the to-be-formed entity.

58.     In furtherance of his proposal, Abellan represented to N2 Packaging's principals that he had the perfect team for N2 Packaging to partner with in Canada—namely, the other N2 Canada Principals Marciniak and Pogue.  However, unbeknownst to N2 Packaging, but known to Abellan and the N2 Canada Principals, Abellan's proposal is a part of a larger Scheme (defined below) to defraud N2 Packaging, gain unlawful access to N2 Packaging's Intellectual Property, and misappropriate N2 Packaging's Proprietary Process for their unlawful pecuniary gain.

59.     In reliance on Abellan's additional material warranties and representations regarding the protection of N2 Packaging's Intellectual Property and safe expansion of N2 Packaging's brand, N2 Packaging agreed to enter into discussions with the N2 Canada Principals to negotiate, prepare and execute an agreement with a to-be-formed entity named N2 Canada.  Further, in anticipation of partnering with the to-be-formed N2 Canada, N2 Packaging terminated the exclusivity of the Chakra Supply Agreement, while keeping the agreement in force.

60.     Shortly thereafter, N2 Packaging's principals engaged in discussions with the N2 Canada and/or unnamed third-parties to negotiate a packaging supply agreement in Canada, whereby the to-be-formed N2 Canada would have the exclusive distribution rights from N2 Packaging to certain packing systems that utilize N2 Packaging's Intellectual Property and

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

Proprietary Process in Canada (the "N2 Canada Supply Agreement")(the IC Agreement, the Chakra Supply Agreement and the N2 Canada Supply Agreement collectively referred to hereafter as the "Agreements").

61.    As part of the negotiation process, the N2 Canada Principals and/or unnamed third-parties represented and warranted to N2 Packaging that they duly formed a Canadian entity named N2 Canada in British Columbia, Canada, for the purpose effectuating the N2 Canada Supply Agreement, and marketing and selling N2 Packaging's Proprietary Process in Canada.

62.    However, unbeknownst to N2 Packaging, but known to the N2 Canada Principals, they never actually formed or intended to form N2 Canada as a real corporate entity in Canada.  Upon information and belief, N2 Canada is a fictitious business name used by the N2 Canada Principals to mask their individual unlawful acts as described herein under the guise of purported principal officers and/or shareholders to a legitimate business enterprise.  Further, upon information and belief, there is such a unity of interest between the un-incorporated fictitious entity N2 Canada and the purported N2 Canada Principals that they are one and the same, and N2 Canada is nothing more than a front and poorly veiled attempt to shield the N2 Canada Principals of personal liability from their unlawful conduct.

63.    On December 22, 2017 ("Effective Date"), N2 Packaging and N2 Canada entered into the N2 Canada Supply Agreement, attached hereto as "**Exhibit F**."

64.    After the Effective Date of the N2 Canada Supply Agreement, N2 Packaging and N2 Canada engaged in a business relationship whereby N2 Canada would, amongst other things, (a) procure and secure orders for N2 Packaging's Proprietary Process in Canada, (b) enter into contracts and/or agreements with third-parties in Canada to sell N2 Packaging's Proprietary Process, (c) place orders on behalf of said third-parties to N2 Packaging, (d) remit payment on said third-parties' behalf to N2 Packaging, and (e) coordinate the transfer and implementation of N2 Packaging's Proprietary Process from N2 Packaging to said third-parties

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

(collectively, the "Business Relationship").

65.     N2 Packaging's primary obligation under the N2 Canada Supply Agreement was to manufacture, produce and provide to N2 Canada packaging systems that utilize N2 Packaging's Intellectual Property and Proprietary Process in response to specific orders from third-parties through N2 Canada, and that of which are in compliance with applicable laws, regulations and requirements.

66.     On September 19, 2018, N2 Packaging terminated the exclusivity provision in the N2 Canada Supply Agreement with N2 Canada titled "Preferred Exclusive Basis," for, amongst other reasons, N2 Canada's failure to comply with certain purchase volume requirements as set forth in Section 6 of the N2 Canada Supply Agreement titled "High Volume Minimum Requirements of Packaging Materials".

67.     The N2 Canada Supply Agreement remained in force after N2 Packaging's termination of N2 Canada's Preferred Exclusive Basis.

68.     Pursuant to the N2 Canada Supply Agreement, and during the course of the Business Relationship, N2 Packaging gave N2 Canada limited access to certain confidential and proprietary information regarding N2 Packaging's Intellectual Property and Proprietary Process.

69.     N2 Packaging also provided N2 Canada a limited license to utilize N2 Packaging's Intellectual Property and Proprietary Process as necessary to perform N2 Canada's obligations under the N2 Canada Supply Agreement.

70.     N2 Packaging only provided N2 Canada a limited license to utilize N2 Packaging's Intellectual Property and Proprietary Process to effectuate the Business Relationship and subject to the terms of the N2 Canada Supply Agreement.

71.     N2 Packaging retained sole and exclusive ownership interest and rights in the N2 Canada Supply Agreement over N2 Packaging's Intellectual Property and Proprietary Process.

72.     N2 Canada obtained no ownership interest or rights over N2 Packaging's

Intellectual Property and Proprietary Process pursuant to the N2 Canada Supply Agreement beyond the limited license conferred therein.

73.    N2 Packaging never authorized, consented to or otherwise gave N2 Canada permission to utilize N2 Packaging's Intellectual Property and Proprietary Process under any other terms apart from the limited license.

74.    Pursuant to the terms of the N2 Canada Supply Agreement, N2 Canada was required to protect and not misappropriate N2 Packaging's Proprietary Process, which is defined in Section 1(9) of the N2 Canada Supply Agreement to include "P2 Packaging's Patented proprietary process (described in that certain patent issued: Patent No. US 8,863, 947 B2 issued October 21, 2014), including, without limitation, any and all modifications, betterments and advances to said proprietary process, whether or not patentable."

75.    Section 10 of the N2 Canada Supply Agreement, titled "Exclusivity," requires that:

> During the term of this Agreement, [N2 Canada]: shall not utilize a packaging line of any type to package Product utilizing N2 Packaging's Packaging Process; and (ii) **shall not utilize N2 Packaging's Proprietary Process or the packaging equipment for any purpose or reason other than to package its Product** . . . N2 Packaging shall have the right to terminate this Agreement immediately upon breach by [N2 Canada] of the terms of this Agreement, and **specifically in this Section, and may seek injunctive relief upon any violation or threatened violation of the terms of this Section, in addition to all other rights and remedies available at law or in equity**, without having to post a bond or other security. (Emphasis added).

76.    Additionally, Section 11 of the N2 Canada Supply Agreement, titled "Ownership of Proprietary Process; Confidentiality," mandates that:

> **Proprietary Process**.  N2 Packaging owns the Proprietary Process, including all applicable patent(s).  [N2 Canada] shall have no right, title or interest in or to the Proprietary Process, except the limited license to utilize the Proprietary Process pursuant to and in accordance with this Agreement.  **[N2 Canada] shall have no rights under any technology rights, whether patentable or not, or any patents, patent applications, trade secrets or other proprietary rights of N2 Packaging.  [N2 Canada] shall not modify or otherwise reverse engineer the Proprietary Process; and shall not seek any intellectual property protection, including without limitation, any patent relating to or otherwise directed to the manufacture or use**

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

**of the Proprietary Process in conjunction or in combination with any other product or process utilizing, employing or otherwise applying the Proprietary Process or any portion or derivations thereof** . . ., and [N2 Canada] shall not take any actions inconsistent with such ownership by N2 Packaging.  N2 Packaging shall have the right to terminate this Agreement immediately upon breach by [N2 Canada] of the terms of this Agreement, and specifically this Section, and may seek injunctive relief upon  any violation or threatened violation of the terms of this Section, in addition to all other rights and remedies available at law or in equity, without having to post a bond or other security. (Emphasis added).

77.     Further, the "Mutual Confidentiality; Required Disclosure by Law" section of the N2 Canada Supply Agreement, as set forth in Section 11, requires that:

**The Confidential Information received by a party (the "Receiving Party") from the other party (the "Disclosing Party") shall not be disclosed by the Receiving Party to any Third Party without the express written consent of the Disclosing Party**; and shall not be used by the Receiving Party for any purposes other than those contemplated by this Agreement. (Emphasis added).

78.     As described in greater detail below, the N2 Canada Defendants breached Section 10 and 11 of the N2 Canada Supply Agreement by improperly disclosing confidential information and trade secrets relating to N2 Packaging's Intellectual Property and Proprietary Process to third-parties without N2 Packaging's knowledge, authorization or consent.

79.     Additionally, the N2 Canada Defendants breached Section 10 and 11 of the N2 Canada Supply Agreement by conspiring with the third-parties to misappropriate and actually infringing upon N2 Packaging's Intellectual Property and Proprietary Process by, amongst other things, (a) reverse engineering and/or modifying N2 Packaging's Intellectual Property and Proprietary Process for the Defendants' pecuniary gain without N2 Packaging's knowledge or consent, (b) conspiring with third-parties to illegally seek intellectual property protection of N2 Packaging's Intellectual Property and Proprietary Process in Canada without N2 Packaging's knowledge or consent, and (c) marketing packaging systems for sale that utilize N2 Packaging's Intellectual Property and Proprietary Process through a third-party entity without N2 Packaging's knowledge or consent.

80.     Upon information and belief, the N2 Canada Principals authorized and/or

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

otherwise caused N2 Canada to undertake the unlawful and improper acts of misappropriation and infringement of N2 Packaging's Intellectual Property and Proprietary Process as described herein.

81.     The N2 Canada Principals oversaw, managed and controlled N2 Canada in such a manner, and with such unity of interest, that N2 Canada was nothing more than a "puppet" for the N2 Canada Principal's unlawful activities, under the guise of a legitimate enterprise, and a un-incorporated "shell" company for the N2 Canada Principals to avoid personal liability or prosecution for their acts.

### The Conspiracy to Infringe upon Plaintiff's Intellectual Property

82.     Upon information and belief, Truro Herbal Co. ("Truro") is a licensed producer of medical and adult-use cannabis pursuant to Canada's Access to Cannabis for Medicinal Purposes Regulations.

83.     During the Business Relationship, the N2 Canada Defendants entered into a verbal agreement with Truro for N2 Canada to purchase packaging systems from N2 Packaging that utilize N2 Packaging's Intellectual Property and Proprietary Process and deliver said systems to Truro.

84.     On or about March 12, 2018, the Truro placed an order through N2 Canada for N2 Packaging' proprietary packaging systems that utilize N2 Packaging's Intellectual Property (the "Truro Order").

85.     N2 Packaging never entered into any agreements with Truro in relation to the Truro Order.

86.     Upon information and belief, the N2 Canada Principals had an existing business and/or personal relationship with the Truro.

87.     As early as August 2018, the N2 Canada Defendants, the Chakra Defendants Truro, and DOES 1-10 engaged in communications and/or negotiations with each other and unknown third-parties (collectively, "Conspirators") to conspire and formulate an unlawful and

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

nefarious plan to defraud N2 Packaging by misappropriating and infringing upon N2 Packaging's Intellectual Property and Proprietary Process to the Conspirator's pecuniary gain and N2 Packaging's detriment (collectively, the "Scheme").

88.     Upon information and belief, Truro and DOES 1-10 were at all relevant times aware of the N2 Canada Supply Agreement between N2 Packaging and N2 Canada.

89.     The Conspirators engaged in the Scheme to usurp N2 Packaging's business opportunities in Arizona, the United States and elsewhere, as well as to exploit N2 Packaging's Intellectual Property, Proprietary Process and publicity and goodwill regarding the same, for the Conspirator's pecuniary gain, without the need to expend the significant resources that was required of N2 Packaging to design, develop and patent N2 Packaging's Intellectual Property.

90.     Upon information and belief, the Conspirators sought, initiated and/or are actively attempting to reverse engineer and/or modify N2 Packaging's Intellectual Property and Proprietary Process that was in N2 Canada's possession and/or the N2 Canada Defendants had access to, in order to market and sell N2 Packaging's Intellectual Property as their own in Arizona, the United States and elsewhere.

91.     The Conspirators have also sought and/or are attempting to procure intellectual property protection in Canada to claim N2 Packaging's Intellectual Property and Proprietary Process as their own without N2 Packaging's knowledge or consent, and in spite of the Conspirator's knowledge that they hold no title or claim to N2 Packaging's Intellectual Property and Proprietary Process that is patented and owned by N2 Packaging.

**The Infringement of Plaintiff's Intellectual Property**

92.     In furtherance of the Scheme, the Conspirators intended to and did in fact incorporate a new Canadian entity for the sole unlawful purpose of misappropriating and infringing upon N2 Packaging's Intellectual Property and Proprietary Process for the Conspirators' pecuniary gain.

93.     On or about early 2018, N2 Packaging and N2 Canada agreed to apply for an

exhibition space at the 2019 Lift & Co. Cannabis Expo to be held in Vancouver, Canada ("Lift Expo"), whereby N2 Packaging and N2 Canada will showcase N2 Packaging's Intellectual Property and Proprietary Process.

94.    On August 10, 2018, Pogue applied to the Lift Expo for N2 Packaging and N2 Canada's intended joint showcase, and the same was approved the by Lift Expo on August 12, 2018.

95.    Upon information and belief, the Conspirators, then, formulated an opportunistic plan whereby a to-be-formed Canadian entity and Truro would take N2 Packaging and N2 Canada's place in the Lift Expo.

96.    In furtherance of the Scheme, Pogue and/or the other N2 Canada Principals, acting under guise of N2 Packaging and N2 Canada, withdrew N2 Packaging and N2 Canada from the Lift Expo without N2 Packaging's knowledge, permission or consent, and substituted Truro and a to-be-formed entity named Nitrotin, Inc., in N2 Packaging and N2 Canada's place.

97.    On January 11, 2019, the Conspirators and/or unknown third parties incorporated a Canadian federal entity known as Nitrotin, Inc. ("Nitrotin"), Canadian Federal Registry ID No. 3282049, for the purpose of misappropriating and using N2 Packaging's Intellectual Property and Proprietary Process without N2 Packaging's knowledge, permission or consent.

98.    Upon information and belief, the principal officers and/or shareholders of Nitrotin are one and the same as the purported principal officers and/or shareholders of N2 Canada and real principal officers and/or shareholders Truro.

99.    On January 15, 2019, Marciniak, who is identified in the article as the Vice President of Nitrotin, conducted an interview with the news outlet Leafly regarding Nitrotin and Truro's exhibition booth at the Lift Expo (the "Leafly Article").

100.    The Leafly article stated that "Nitrotin is a canning company for cannabis, keeping buds fresh till you are ready to crack a green one.  Just like a can of Tuna, Nitrotin comes with a pull tab, an extraordinary shelf and is 100% odor proof said Nitrotin Vice

(Page 18)

President Eric Marciniak. It is also highly childproof, tamper evidence, and 100% recyclable he said. The company uses a drop of liquid nitrogen to push all of the oxygen out of the can before sealing it. Keeping the cannabis in an anaerobic environment means it won't lose flavor; terpeness or its freshness over time said Marciniak."

101. Upon information and belief, the Conspirators had access to N2 Packaging's Intellectual Property and Proprietary Process through N2 Canada's Business Relationship with N2 Packaging, and Truro solicited, induced or otherwise convinced the N2 Canada Principals to disclose confidential and proprietary information relating to N2 Packaging's Intellectual Property to them and other unknown third-party Conspirators in breach of the N2 Canada Supply Agreement, as well as in violation of state and federal law.

102. Upon information and belief, the packaging system purportedly sold by Nitrotin (the Nitrotin Packaging System") is one and the same of the packaging systems designed and patented by N2 Packaging and utilizes N2 Packaging's Intellectual Property and Proprietary Process, including without limitation, the childproof lid, pull tab, odorless design, 100% recyclable design, liquid-nitrogen based process, and atmospheric control.

103. On or about early January 2019, Nitrotin and Truro, through the Conspirators, proceeded to take N2 Packaging's place in the Lift Expo to market and sell N2 Packaging's Intellectual Property and Proprietary Process as their own, without N2 Packaging's knowledge, permission or consent.

104. Since then and in furtherance of the Scheme, the Conspirators, through their puppet Nitrotin, have been marketing and selling, through an online presence and other means, packaging systems that utilize N2 Packaging's Intellectual Property and Proprietary Process as the Nitrotin Packaging System.

105. Nitrotin, acting on behalf of the Conspirators, has publicly represented, warranted and alleged on Nitrotin's website that the Nitrotin Packaging System is a "patented" process, in direct infringement upon N2 Packaging's Intellectual Property and Proprietary Process. A

true and accurate copy of Nitrotin's "home" page as of January 16, 2019, is attached hereto as "**Exhibit G.**"

106.   Nitrotin's product and service descriptions on its website are mere "copy and pastes" of product and service descriptions on N2 Packaging's website.  Compare Exhibit G with a true and accurate copy of N2 Packaging's current "home" page, attached hereto as "**Exhibit H**."

107.   For example, both N2 Packaging's and Nitrotin's homepages allege, word-for-word, that "[o]ur patented process of packaging controlled substances in a hermetically sealed container with a modified atmosphere greatly extends the shelf life of any contents. Our modified seamer hermetically seals each can after it's flushed with liquid nitrogen with an easy to open pop-top lid to create an air-tight and completely odorless package—that is, until you pop the lid and inhale the ripe, harvest-fresh aroma."

108.   Further, both N2 Packaging's and Nitrotin's homepages allege, word-for-word, that "[o]ne of the greatest advantages that nitrogen packaging achieves is the ease of implementation.  Our system is designed for companies to quickly make a transition to a more efficient and all around higher quality packaging system."

109.   Additionally, both N2 Packaging's and Nitrotin's homepages similarly allege six product qualifications that sets them apart from competitors: (a) freshness, (b) sustainable packaging, (c) shelf-life (extended), (d) branding, (e) inventory control, and (f) tracking.

110.   In doing so, Nitrotin, as directed by the Conspirators, and for the benefit of the Defendants, are purportedly acting as N2 Packaging's representatives and/or under the guise that they have the permission, authorization and consent of N2 Packaging to utilize N2 Packaging's Intellectual Property and Proprietary Process in Arizona, the United States and elsewhere, with knowledge that they do not have N2 packaging's permission, authorization or consent to do the same.

111.   Upon information and belief, Nitrotin, the Conspirators, the Defendants, and

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

unknown third-party Conspirators have also been reaching out to N2 Packaging's existing and potential customers, under the guise of acting with N2 Packaging's authority, to unlawfully market and sell the Nitrotin Packaging System that directly infringes upon N2 Packaging's Intellectual Property and Proprietary Process.

112.    Sometime after the formation of Nitrotin, N2 Packaging became aware of the Defendants' public attempts to misappropriate, infringe upon and misuse N2 Packaging's Intellectual Property and Proprietary Process through, amongst other things, Nitrotin's website, Nitrotin and Truro's exhibit at the Lift Expo, and public statements from the Defendants.

113.    Upon information and belief, the Nitrotin Packaging System Defendants displayed at the Lift Expo which bared Truro's logo were misappropriated packaging systems belonging to and owned by N2 Packaging that N2 Packaging provided to N2 Canada during the Business Relationship and Defendants illegally "white-labeled" for their unlawful use.

114.    Upon information and belief, Defendants unlawfully obtained access to packaging systems utilizing N2 Packaging's Intellectual Property that were in their possession and/or control and that they had access to pursuant to the Agreements.

115.    Additionally, since the formation of Nitrotin, N2 Packaging became aware of Defendants' public attempts to actively market and sell the Nitrotin Packaging System that infringes upon N2 Packaging's Intellectual Property through, amongst other things, soliciting customers and selling the Nitrotin Packaging System in a physical storefront named Canna Can, located at 1806 Cook St., Victoria, British Columbia.

116.    Further, in furtherance of the Scheme, the Conspirators began actively marketing and selling "white-labeled" Nitrotin Packaging Systems that are in reality stolen packaging systems belonging to N2 Packaging and utilize N2 Packaging's Intellectual Property through Defendants' respective entities without N2 Packaging's express permission, authorization or consent.  For example, since the formation of Nitrotin, Abellan has been actively promoting the infringing Nitrotin Packaging System through his entity Chakra.  A true an accurate copy of

Chakra's "home" page as of March 28, 2019, which exhibits "white-labeled" tins that are actually N2 Packaging's tins utilizing N2 Packaging's Intellectual Property without N2 Packaging's knowledge or consent, is attached hereto as "**Exhibit K**."

117.    As a direct result of the Defendants' actions as described herein, N2 Packaging has been and continue to be damaged  in significant and not yet ascertainable amounts by, amongst other things, (a) the loss of and/or diminution to N2 Packaging's Intellectual Property, Proprietary Process and accompanying publicity and goodwill, including the significant time and resources N2 Packaging has expended towards designing, developing and refining its innovative processes, (b) the loss of business, business opportunities and/or customers from the Defendants' active interference with N2 Packaging's contracts and business relations, including false representations made in conjunction therewith, and (c) other economic and/or reputational harm to be determined at trial.

### Count One

### (Breach of Contract)

### (against N2 Canada Defendants)

118.    Plaintiff realleges and incorporates by reference the above allegations in this Complaint as though fully set forth herein.

119.    N2 Packaging and the N2 Canada Defendants entered into the N2 Canada Supply Agreement.

120.    Pursuant to Section 10 of the N2 Canada Supply Agreement, the N2 Canada Defendants "shall not utilize N2 Packaging's Proprietary Process or the packaging equipment for any purpose other than to package its Product."

121.    The N2 Canada Defendants breached Section 10 of the N2 Canada Supply Agreement by facilitating and/or working in conjunction with Truro, DOES 1-10, Conspirators and Nitrotin to misappropriate and infringe upon N2 Packaging's Intellectual Property and Proprietary Process as their own through marketing and selling the Nitrotin Packaging System

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

as described herein.

122.   The N2 Canada Defendants breached Section 11(1) of the N2 Canada Supply Agreement by falsely representing and designating to the public that the N2 Canada Defendants, as principal officers and/or shareholders of Nitrotin, own a "patented process" in the Nitrotin Packaging System that actually utilizes N2 Packaging's Intellectual Property and Proprietary Process.

123.   The N2 Canada Defendants further breached Section 11(1) of the N2 Canada Supply Agreement by, amongst other things, (a) providing Truro, DOES 1-10, Conspirators and Nitrotin with access to the Proprietary Process and N2 Packaging's Intellectual Property, (b) assisting with or directly participating in Truro, DOES 1-10, Conspirators and Nitrotin's Scheme to reverse engineer, modify, misappropriate or otherwise infringe upon N2 Packaging's Intellectual Property and Proprietary Process to develop the Nitrotin Packaging System, and (c) assisting with or directly procuring intellectual property protection for the Nitrotin Packaging System for Truro, DOES 1-10, Conspirators and Nitrotin.

124.   N2 Packaging asserted its rights under Section 11(1) and demanded in writing that the N2 Canada Defendants to take all necessary actions to protect N2 Packaging's Intellectual Property from the Defendants, DOES 1-10, Conspirators and Nitrotin.

125.   The N2 Canada Defendants have failed to take the necessary actions described in N2 Packaging's written demand, and additionally breached Section 11(1) on such grounds.

126.   The N2 Canada Defendants also breached Section 11(2) of the N2 Canada Supply Agreement by disclosing, sharing and/or otherwise disseminating confidential information and trade secrets relating to N2 Packaging's Intellectual Property and Proprietary Process to Truro, DOES 1-10, Conspirators, and Nitrotin.

127.   The N2 Canada Defendants breach of Sections 10 and 11 of the N2 Canada Supply Agreement as described herein was intentional.

128.   The N2 Canada Defendants also had knowledge that their actions as described

herein would place them in breach of Sections 10 and 11 of the N2 Canada Supply Agreement.

129.   As a direct, consequential and proximate result of the N2 Canada Defendants' breach of Sections 10 and 11 of the N2 Canada Supply Agreement, N2 Packaging has been damaged in (a)  the misappropriation, infringement and misuse of N2 Packaging's Intellectual Property and Proprietary Process, (b) the loss of certain business opportunities, (c) the disclosure of confidential information and trade secrets, and (d) other economic and reputational harm as described herein.

<u>**Count Two**</u>

**(Breach of Contract)**

**(against Abellan)**

130.   Plaintiff realleges and incorporates by reference the above allegations in this Complaint as though fully set forth herein.

131.   N2 Packaging and Abellan entered into the IC Agreement.

132.   Pursuant to Section 2(a) of the IC Agreement, Abellan "shall have no right, title or interest in or to the Proprietary Process, any rights any technology rights, whether patentable or not, or any patents, patent applications, trade secrets or other proprietary rights of N2 Packaging . . .[,] shall not modify or otherwise reverse engineer the Proprietary Process . . .[,] seek any intellectual property protection, including without limitation, any patent relating to or otherwise directed to the manufacture or use of the Proprietary Process …[,] shall execute such documentation and other steps requested by N2 Packaging to maintain, establish and protect N2 Packaging's ownership interests in the proprietary Process, and [] shall not take any actions inconsistent with such ownership by N2 Packaging."

133.   Abellan breached Section 2(a) of the IC Agreement by, amongst other things, conspiring (and, acting in concert with) with the Conspirators and unknown third-parties to (a) seek patent protection for the Nitrotin Packaging System that infringes upon N2 Packaging's Intellectual Property, (b) modify or otherwise revere engineer N2 Packaging's Intellectual

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

Property, (c) "white-label" and misappropriate N2 Packaging's Intellectual Property and Proprietary Process to market and sell as their own, and (d) promote and sell the Nitrotin Packaging System that infringes upon N2 Packaging's Intellectual Property through an online and store-front presence.

134.    Abellan also breached Section 2(a) of the IC Agreement by, amongst other things, refuting and flouting N2 Packaging's written demands to Abellan to adhere to his contractual obligations and take the necessary actions to stop infringement on N2 Packaging's Intellectual Property and protect the same from the Conspirators.

135.    Additionally, pursuant to Section 2(c) of the IC Agreement, Abellan covenanted to "maintain the [Proprietary Process] as completely confidential and secret at all times; and shall not, at any time, either during or subsequent to the business relationship with N2 Packaging, directly or indirectly, use, disseminate, appropriate, disclose or divulge any Proprietary Information to any third party entity, or individual, unless authorized or directed to do so by N2 Packaging, or required to do so by a court or other governmental entity acting with the force of law."

136.    Abellan breached Section 2(a) of the IC Agreement by, amongst other things, improperly disclosing to Defendants and the Conspirators confidential information regarding N2 Packaging's Intellectual Property and Proprietary Process, without N2 Packaging's knowledge or authorization, and with a purpose to further the Scheme and allow the Conspirators to modify, reverse engineer, or otherwise infringe upon N2 Packaging's Intellectual Property for the Conspirator's unlawful pecuniary gain.

137.    Moreover, pursuant to Section 2(d) of the IC Agreement, Abellan covenanted to "not use the Proprietary Information [containing the Proprietary Process]: (a) to provide any services to or on behalf of any person or entity, either as independent contractor, consultant or employee; or (b) to engage or become interested (as owner, stockholder, partner, director, officer, consultant, member or creditor) in any business or operation directly or indirectly

Rose Law Group PC
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

competitive to N2 Packaging."

138.   Abellan breached Section 2(d) of the IC Agreement by, amongst other things, (a) providing services to Chakra and Nitrotin in connection with the Conspirator's Scheme to market and sell the Nitrotin Packaging Systems that infringe upon N2 Packaging's Intellectual Property, and (b) acting as owner, stockholder, partner, director, officer, consultant, member, or creditor to Chakra and Nitrotin in furtherance of the same.

139.   Abellan's breach of Sections 2(a), 2(c) and 2(d) of the IC Agreement as described herein was intentional.

140.   Abellan also had knowledge that his actions as described herein would place him in breach of Sections 2(a), 2(c) and 2(d) of the IC Agreement.

141.   As a direct, consequential and proximate result of Abellan's breach of the IC Agreement, N2 Packaging has been damaged in (a) the misappropriation, infringement and misuse of N2 Packaging's Intellectual Property and Proprietary Process, (b) the loss of certain business opportunities, (c) the disclosure of confidential information and trade secrets, and (d) other economic and reputational harm as described herein.

## **Count Three**

### **(Breach of Contract)**

### **(against Chakra)**

142.   Plaintiff realleges and incorporates by reference the above allegations in this Complaint as though fully set forth herein.

143.   N2 Packaging entered into the Chakra Supply Agreement with Chakra.

144.   Pursuant to Section 11 of the Chakra Supply Agreement, Chakra "shall not utilize a packaging line of any type to package Product utilizing N2 Packaging's Packaging Process; and [] shall not utilize N2 Packaging's Proprietary Process or the packaging equipment . . ., for any purpose or reason other than to package its Product."

145.   Chakra breached Section 11 of the Chakra Supply Agreement by, amongst other

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

things, (a) utilizing and misappropriating N2 Packaging's Intellectual Property and Proprietary Process for use as the Nitrotin Packaging System, (b) assisting the Conspirators with "white-labeling" N2 Packaging's proprietary packaging tins, and (c) displaying and marketing the "white-labeled" tins on Chakra's website.

146.   Additionally, pursuant to Section 12(1) of the Chakra Supply Agreement, Chakra shall have no right, title or interest in or to the Proprietary Process, except the limited license to utilize the Proprietary Process pursuant to and in accordance with this Agreement [,] shall have no rights under any technology rights, whether patentable or not, or any patents, patent applications, trade secrets or other proprietary rights of N2 Packaging . . .[,] shall not modify or otherwise reverse engineer the Proprietary Process . . .[,] seek any intellectual property protection, including without limitation, any patent relating to or otherwise directed to the manufacture or use of the Proprietary Process …[,] shall execute such documentation and other steps requested by N2 Packaging to maintain, establish and protect N2 Packaging's ownership interests in the proprietary Process, and [] shall not take any actions inconsistent with such ownership by N2 Packaging."

147.   Chakra breached Section 12(1) of the Chakra Supply Agreement by, amongst other things, (a) assisting the Conspirators with unlawfully accessing N2 Packaging's Intellectual Property and Proprietary Process without N2 Packaging's knowledge or consent, (b) assisting the Conspirators with (or, providing the means to) modifying, reverse engineering or otherwise misappropriating N2 Packaging's Intellectual Property and Proprietary Process, and (c) refuting and flouting N2 Packaging's written demands to Chakra to adhere to its contractual obligations and take the necessary actions to stop infringement on N2 Packaging's Intellectual Property and protect the same from the Conspirators.

148.   Moreover, pursuant to Section 12(2) of the Chakra Supply Agreement, the "Confidential Information [regarding N2 Packaging's Intellectual Property] received by [Chakra] from [N2 Packaging] shall not be disclosed by [Chakra] to any Third Party without

the express written consent of [N2 Packaging] . . ..”

149.   Chakra breached Section 12(2) of the Chakra Supply Agreement by, amongst other things, unlawfully disclosing confidential, proprietary and trade secret information regarding N2 Packaging's Intellectual Property and Proprietary Process to the Conspirators and other unknown third-parties without N2 Packaging's knowledge, authorization or consent.

150.   Chakra's breach of Sections 11, 12(1) and 12(2) of the Chakra Supply Agreement as described herein was intentional.

151.   Chakra also had knowledge that its actions as described herein would place it in breach of Sections 11, 12(1) and 12(2) of the Supply Agreement.

152.   As a direct, consequential and proximate result of Chakra's breach of the Chakra Supply Agreement, N2 Packaging has been damaged in (a) the misappropriation, infringement and misuse of N2 Packaging's Intellectual Property and Proprietary Process, (b) the loss of certain business opportunities, (c) the disclosure of confidential information and trade secrets, and (d) other economic and reputational harm as described herein.

### Count Four

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

**(against all Defendants)**

153.   Plaintiff realleges and incorporates by reference the above allegations in this Complaint as though fully set forth herein.

154.   The Defendants owed N2 Packaging a duty of good faith and fair dealing when they negotiated and entered into the IC Agreement, the Chakra Supply Agreement, and the N2 Canada Supply Agreement.

155.   N2 Packaging had a justified expectation when entering into the IC Agreement, the Chakra Supply Agreement, and the N2 Canada Supply Agreement that the Defendants would protect and not misappropriate (or, assist others to) N2 Packaging's Intellectual Property and Proprietary Process as consideration for N2 Packaging granting a limited license to

Defendants in Canada to distribute packaging systems utilizing N2 Packaging's Intellectual Property.

156.    Defendants breached N2 Packaging's justified expectation in the protection of N2 Packaging's Intellectual Property and Proprietary Process by facilitating, engaging and/or otherwise participating in the Scheme.

157.    Defendants' actions as described herein denied N2 Packaging's reasonably expected benefit of the bargain, which was an opportunity to market and sell systems utilizing N2 Packaging's Proprietary Process in Canada without fear of infringement upon N2 Packaging's Intellectual Property by the Defendants or anyone else.

158.    Defendants' breach of the implied covenant of good faith and fair dealing was intentional and done in bad faith.

159.    As a result of the N2 Canada Defendants' actions as described herein, N2 Packaging has been directly, consequently and proximately damaged in an amount to be proven at trial.

**<u>Count Five</u>**

**(Tortious Interference with Contract)**

**(against Abellan)**

160.    Plaintiff realleges and incorporates by reference the above allegations in this Complaint as though fully set forth herein.

161.    N2 Packaging is a party to the Chakra Supply Agreement and N2 Canada Supply Agreement.

162.    Abellan, as the real or purported principal officer and/or shareholder to both the duly formed Chakra and un-incorporated fictious entity N2 Canada, is and was aware at all relevant times of the Chakra Supply Agreement and N2 Canada Supply Agreement.

163.    Abellan interfered with both the Chakra Supply Agreement and N2 Canada Supply Agreement by, amongst other things, (a) ordering, causing or otherwise inducing

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

Chakra and N2 Canada to breach their Agreements with N2 Packaging, and (b) causing such entities to unlawfully disclose confidential, proprietary and trade secret information on N2 Packaging's Intellectual Property and Proprietary Process to the Conspirators so as to allow the Conspirators to misappropriate upon N2 Packaging's Intellectual Property.

164.    Abellan, as an organizer of the Scheme, intentionally interfered with N2 Packaging's contractual relations to defraud N2 Packaging and obtaining a windfall in the underlying transactions.

165.    Abellan's conduct was improper and in breach of all Agreements.

166.    As a direct result of Abellan's tortious conduct as described herein, N2 Packaging has been directly, consequently and proximately damaged in an amount to be proven at trial.

## Count Six

### (Fraud in the Inducement)

### (against Abellan)

167.    Plaintiff realleges and incorporates by reference the above allegations in this Complaint as though fully set forth herein.

168.    Abellan is a party—either, personally or in his capacity as real or purported principal officer and/or shareholder to the Puppet Entities (defined below)—to all Agreements.

169.    Upon information and belief, Abellan gave N2 Packaging intentionally false information regarding his motives in entering into the Agreements and the purported Intellectual Property protection that the Agreements and Business Relationship will afford N2 Packaging in Canada.

170.    During negotiations for the Agreements, Abellan made materials representations regarding, amongst other things, that (a) he will not misappropriate or otherwise infringe upon N2 Packaging's Intellectual Property and Proprietary Process, (b) Chakra will not misappropriate or otherwise infringe upon N2 Packaging's Intellectual Property and Proprietary Process, and (c) the N2 Canada Principals will not misappropriate or otherwise

infringe upon N2 Packaging's Intellectual Property and Proprietary Process.

171.   Additionally, pursuant to Sections 2(c) and 2(d) the IC Agreement, Abellan materially represented that, amongst other things, he (a) will maintain N2 Packaging's Intellectual Property and Proprietary Process, (b) will not use N2 Packaging's Intellectual Property with third parties subject to the terms of the IC Agreement, and (c) will not engage or become interested as an owner, stockholder, partner director, officer, consultant, member or creditor in any business or operation directly or indirectly competitive to N2 Packaging.

172.   However, unbeknownst to N2 Packaging, but known to Abellan, Abellan never intended to keep his promises or abide by the material representations that he made to N2 Packaging regarding protecting N2 Packaging's Intellectual Property as he was secretly organizing the Scheme in the background of the negotiation of the Agreements.

173.   Upon information and belief, Abellan made the materially false representations as described herein as to induce N2 Packaging into entering the Agreements and obtain unlawful access to N2 Packaging's Intellectual Property with the intent to misappropriate and infringe upon the same, while omitting the material fact that Abellan never intended to honor his Intellectual Property protection obligations under the Agreements.

174.   By concealing the Scheme and Abellan's true intent to induce N2 Packaging into entering the Agreements, Abellan falsely represented to N2 Packaging that what it disclosed concerning the protection of N2 Packaging's Intellectual Property in Canada and elsewhere was the whole truth—despite Abellan's knowledge to the contrary.

175.   By Abellan's false representations and omissions of material facts, Abellan fraudulent induced N2 Packaging into entering the Agreements.

176.   N2 Packaging was unaware that the representations and omissions of Abellan were false, misleading and inaccurate when made.

177.   N2 Packaging reasonably and justifiably relied upon Abellan's material representations and omissions concerning the Agreements and Business Relationship in making

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

its decision to enter into the Agreements.

178.    As a direct result of Abellan's fraudulent conduct as described herein, N2 Packaging has been directly, consequently and proximately damaged in an amount to be proven at trial.

## Count Seven

### (Fraud in the Inducement)

### (against the N2 Canada Principals)

179.    Plaintiff realleges and incorporate by reference the above allegations in this Complaint as though fully set forth herein.

180.    The N2 Canada Principals authorized and/or are signatories to the N2 Canada Supply Agreement with N2 Packaging.

181.    Upon information and belief, the N2 Canada Principals gave N2 Packaging intentionally false information regarding (a) their motives in entering into the N2 Canada Supply Agreement, (b) the formation of N2 Canada, and (c) the purported Intellectual Property protection that the N2 Canada Supply Agreement and Business Relationship will afford N2 Packaging in Canada.

182.    During negotiations for the N2 Canada Supply Agreement, the N2 Canada Principals made material representations regarding, amongst other things, that (a) the N2 Canada Defendants will not misappropriate or otherwise infringe upon N2 Packaging's Intellectual Property, (b)  the N2 Canada Principals will be incorporating a real Canadian entity named N2 Canada to expand N2 Packaging's business in Canada while protecting its brand, (c) the N2 Canada Defendants will take all necessary steps to protect and prevent the infringement of N2 Packaging's Intellectual Property.

183.    However, unbeknownst to N2 Packaging, but known to the N2 Canada Principals, they never intended to keep their promises or abide by the material representations they made in the N2 Canada Supply Agreement to protect N2 Packaging's Intellectual Property,

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

as the N2 Canada Principals were a part of the Conspirators organizing the Scheme to defraud N2 Packaging.

184.    Upon information and belief, the N2 Canada Principals made the materially false representations as described herein as to induce N2 Packaging into entering the N2 Canada Supply Agreement and obtain unlawful access to N2 Packaging's Intellectual Property with the intent to misappropriate and infringe upon the same, while omitting the material fact that the N2 Canada Principals never intended to honor their Intellectual Property protection obligations under the N2 Canada Supply Agreement or duly form an entity in protection of the same.

185.    By concealing the Scheme and the N2 Canada Principals' true intent to induce N2 Packaging into entering the N2 Canada Supply Agreement, the N2 Canada Principals falsely represented to N2 Packaging that what they disclosed concerning the protection of N2 Packaging's Intellectual Property in Canada and elsewhere was the whole truth—despite their knowledge to the contrary

186.    By the N2 Canada Principals' false representations and omissions of material facts, the N2 Canada Principals fraudulent induced N2 Packaging into entering the N2 Canada Supply Agreement.

187.    N2 Packaging was unaware that the representations and omissions of the N2 Canada Principals were false, misleading and inaccurate when made.

188.    N2 Packaging reasonably and justifiably relied upon the N2 Canada Principals' material representations and omissions concerning the N2 Canada Supply Agreement and Business Relationship in making its decision to enter into the N2 Canada Supply Agreement.

189.    As a direct result of the N2 Canada Principal's fraudulent conduct as described herein, N2 Canada has been directly, consequently and proximately damaged in an amount to be proven at trial.

///

///

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251

## Count Eight

### (Alter Ego)

### (against N2 Canada Principals)

190.    Plaintiff realleges and incorporates by reference the above allegations in this Complaint as though fully set forth herein.

191.    The N2 Canada Principals and/or Abellan have been employing their respective entities as a "puppet" for fraudulent and unlawful purposes, including the duly formed Chakra and the un-incorporated fictitious entity N2 Canada (Chakra and N2 Canada collectively referred to hereafter as the "Puppet Entities").

192.    The N2 Canada Principals and/or Abellan directly facilitated, organized, participated and/or engaged in the Scheme to misappropriate and infringe upon N2 Packaging's Intellectual Property and Proprietary Process.

193.    In furtherance of the Scheme, the N2 Canada Principals and/or Abellan directed, operated, managed, and/or otherwise caused the Puppet Entities and DOES 1-10 to undertake fraudulent, illegal and unlawful actions that either breached Agreements, interfered with the Agreements, or misappropriated and infringed upon N2 Packaging's Intellectual Property and Proprietary Process for the N2 Canada Principals' personal unlawful pecuniary gain.

194.    Further, the N2 Canada Principals and/or Abellan operated the Puppet Entities in such a manner that the line separating a legitimate enterprise and an unlawful one has been blurred, such that the Puppet Entities are nothing more than "shell" corporations to shield the N2 Canada Principals and/or Abellan from personal liability and prosecution for their fraudulent, illegal and unlawful acts.

195.    Additionally, the N2 Canada Principals and/or Abellan not only influenced or governed their respective entities, but there was also such a unity of interest and ownership—the perpetration and furtherance of the Scheme—that the individuality or separateness of the N2 Canada Principals and their respective entities have ceased to exist.

196.   As a direct result of the N2 Canada Principals' actions as described herein, N2 Packaging has been directly, consequently and proximately damaged in an amount to be proven at trial.

## Count Nine

### (Violation of A.R.S. § 44-1522; Unlawful Practices)

### (against all Defendants)

197.   Plaintiff realleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

198.   The Defendants, by causing Nitrotin to advertise and promote the Nitrotin Packaging System as the product of their own creation and patent as opposed to the misappropriation of N2 Packaging's Intellectual Property and Proprietary Process, misrepresents the true origin and  unlawful nature of the Nitrotin Packaging System, which constitutes a concealment, suppression or omission of an unlawful practice in advertisement.

199.   Defendants' concealment in connection with the sale and advertisement of the Nitrotin Packaging System is material and likely to mislead consumers in Arizona, the United States and elsewhere, in that the systems the Defendants offer for sale actually utilize N2 Packaging's Intellectual Property and Proprietary Systems without N2 Packaging's authorization, permission or consent.

200.   As a direct result of the Defendants' unlawful practice in concealing the source and origination of the Nitrotin Packaging System, N2 Packaging has been directly, consequently and proximately damaged in an amount to be proven at trial.

## Count Ten

### (Punitive Damages)

### (against all Defendants)

201.   Plaintiff incorporates each and every allegation set forth above as though fully set forth herein.

202.   Defendants' actions as described herein were carried out in a knowing and willful manner with the intent to cause harm to Plaintiff for their personal gain and to improperly obtain a windfall in the underlying business relationships with N2 Packaging.

203.   Defendants' actions are so egregious and of such a nature as to justify punitive damages against Defendants in an amount to be proven at trial.

WHEREFORE, Plaintiff respectfully requests this Court grant it judgment against Defendant and award Plaintiff relief as follows:

a)   For immediate injunctive relief, as set forth in the proposed preliminary injunctive relief order lodged concurrently herewith;

b)   Damages in an amount to be determined at trial;

c)   For all costs and expenses incurred herein, including reasonable attorneys' fees, under A.R.S. §§ 12-341, 12-341.01, 13-2314.04(A);

d)   Punitive damages; and

e)   Such other and further relief, which may seem just and reasonable under the circumstances.

RESPECTFULLY SUBMMITED this 18th day of April, 2019.

**ROSE LAW GROUP pc**

By:  *s/ Justin M. Brandt*
Justin M. Brandt, Esq.
7144 East Stetson Drive, Suite 300
Scottsdale, Arizona 85251
*Attorneys for Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**VERIFICATION**

I, Scott Martin, on behalf of N2 Packaging Systems, LLC ("N2 Packaging"), in

capacity as Chief Executive Officer of N2 Packaging, hereby certify under penalty of per

that I have reviewed the foregoing Verified First Amended Complaint, know the cont

thereof, and that everything therein is true and correct to the best of my knowledge.

4/18/19

Scott Martin, CEO                    Date

Rose Law Group pc
7144 E. Stetson Drive, Suite 300
Scottsdale, AZ 85251