# **<u>EXHIBIT I</u>**

# INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") is by and between N2 Packaging Systems, LLC, an Arizona limited liability company ("N2 Packaging") and Alejo Abellan ("Contractor").

RECITALS:

WHEREAS, N2 Packaging has a patented proprietary process described in that certain patent issued: Patent No. US 8,863,947 B2, issued October 21, 2014 to include, without limitation, any and all modifications, betterments, augmentations and advancements to said proprietary process, whether or not patentable (the "Proprietary Process"); and

WHEREAS, N2 Packaging licenses the Proprietary Process for a packaging process that seals hermetically product in a can for distribution and sale to consumers as described in that certain patent issued: Patent No. US 8,863,947 B2, issued October 21, 2014 to include, without limitation, any and all modifications, betterments, augmentations and advancements to said proprietary process, whether or not patentable (the "Packaging Process"); and

WHEREAS, N2 Packaging and Contractor desire to enter into a contract, on an independent contractor basis, pursuant to which Contractor will market, promote and facilitate in the Country of Canada: **(a)** the licensing of the Proprietary Process, **(b)** the sale of packaging equipment and packaging materials of the Packaging Process to third party entities and individuals, and **(c)** customer service of the licensees of the Proprietary Process (the "Contracted Services"); and

WHEREAS, the purpose of this Agreement is to set forth the terms, conditions, covenants and provisions between N2 Packaging and Contractor, pursuant to which Contractor will, on an independent contractor basis, provide the Contracted Services, and Contractor will respect and honor the confidential and proprietary nature of the Proprietary Information, defined herein below.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual promises, agreements and covenants set forth below, N2 Packaging and Contractor mutually agree as follows.

**Contract Price**. For each license of the Proprietary Process issued by N2 Packaging to third party entities and individuals in Canada as a result of Contractor's Contracted Services, N2 Packaging shall pay Contractor a commission of five cents (5¢) per can of the packaging materials sold by N2 Packaging to such third party entities and individuals in Canada (the "Commission"); subject to the following: **(a)** N2 Packaging reserves the right to establish, set and adjust, from time to time, the price for the license of the Proprietary Process and the prices of packaging equipment and packaging materials of the Packaging Process; **(b)** N2 Packaging reserves the right to accept or decline the licensing of the Proprietary Process to any person or entity; **(c)** Contractor is responsible for, and shall pay without further compensation, contribution or reimbursement from N2 Packaging, any and all costs and expenses associated to, arising from

and otherwise incurred by Contractor to provide the Contracted Services; **(d)** Contractor shall comply with all laws, including tax laws, applicable to Contractor's providing the Contracted Services hereunder, including, not by way of limitation, reporting of all gross receipts, withholding and payment of all employment taxes, and worker compensation laws; **(e)** Contractor shall be solely responsible to secure, maintain and pay for any and all business licenses and permits, and policies of insurance, including, without limitation, general liability and vehicle liability insurance policies; and as to foregoing (c) through (e), Contractor shall indemnify and hold N2 Packaging harmless from and against any claims, demands, losses, judgments, fines arising or resulting from Contractor's failure to do so.

1.    **Contractor as Independent Contractor; Termination of Agreement; and Services Not Exclusive to N2 Packaging**. Contractor and N2 Packaging acknowledge their relationship under this Agreement is intended to be and is that of Contractor being an independent contractor to N2 Packaging, and this Agreement is utilized as Contractor being an independent contractor to N2 Packaging. Nothing contained herein shall create, be deemed to create, or be construed as an agreement or contract for employment between Contractor and N2 Packaging. It is specifically acknowledged, understood and agreed by and between N2 Packaging and Contractor that: **(a)** Contractor is not authorized by anything under this Agreement to bind or contract on behalf of N2 Packaging in any manner whatsoever; and **(b)** Contractor has not been guaranteed, and this Agreement does not constitute a guarantee, that Contractor's relationship with N2 Packaging, under this Agreement or otherwise, will continue for any specified period of time, and that either N2 Packaging or Contractor can terminate their relationship under this Agreement, with or without cause, at any time; provided, however, all Commission shall continue in effect for six (6) months from the termination of this Agreement and such termination shall be effective on thirty (30) days notice by either N2 Packaging or Contractor. Further, nothing in this Agreement shall prohibit or inhibit Contractor from the performance of business services for, or providing such services to, or employment by any third party entity or individual; or otherwise engaging in any lawful business.

2.    **Contractor's Covenants**. Contractor acknowledges, agrees and covenants as follows:

a.    *Proprietary Process*. N2 Packaging owns the Proprietary Process, including all applicable patent(s). Contractor shall have no right, title or interest in or to the Proprietary Process, any rights under any technology rights, whether patentable or not, or any patents, patent applications, trade secrets or other proprietary rights of N2 Packaging. Contractor shall not modify or otherwise reverse engineer the Proprietary Process. Contractor shall not seek any intellectual property protection, including, without limitation, any patent relating to or otherwise directed to the manufacture or use of the Proprietary Process. Contractor shall execute such documentation and take other steps requested by N2 Packaging to maintain, establish and protect N2 Packaging's ownership interests in the Proprietary Process, and Contractor shall not take any actions inconsistent with such ownership by N2 Packaging; and

*aa*

b.    *N2 Packaging's Proprietary Information.* For purposes of this Agreement, "Proprietary Information" shall mean, inclusive of the Proprietary Process, information and material confidential and proprietary to N2 Packaging, to include, not by way of limitation, whether or not reduced to writing: computer programs, system documentation, manuals, methods, techniques, processes, procedures, patented and/or unpatented technology, the identity of customers and prospective customers, and other information related to customers and prospective customers including financial or credit information of customers and prospective customers, suppliers and prospective suppliers, contracts with suppliers and customers, sales proposals, methods of sales, marketing research and data, marketing techniques, marketing materials and plans, price lists, pricing policies and procedures, supply cost information, and financial information and business plans of N2 Packaging. The Proprietary Information: **(a)** is of a confidential and proprietary nature, and constitutes a valuable, special and unique asset to N2 Packaging; **(b)** N2 Packaging possesses a legitimate business interest to protect the Proprietary Information from disclosure to and unauthorized utilization by third party entities and individuals; and **(c)** N2 Packaging otherwise possesses a legitimate business interest to restrict the utilization of the Proprietary Information; and

c.    *Covenants of Confidentiality.* Proprietary Information shall be considered by Contractor to be sensitive, confidential and proprietary in nature. Contractor shall maintain the Proprietary Information as completely confidential and secret at all times; and shall not, at any time, either during or subsequent to the business relationship with N2 Packaging, directly or indirectly, use, disseminate, appropriate, disclose or divulge any Proprietary Information to any third party entity or individual, unless authorized or directed to do so by N2 Packaging, or required to do so by a court or other governmental entity acting with the force of law. If N2 Packaging authorizes or directs Contractor to disclose Proprietary Information to any third party entity or individual, Contractor must ensure that a signed confidentiality agreement for the benefit of N2 Packaging is or has been obtained from the third party to whom Proprietary Information is being disclosed and that all Proprietary Information so disclosed is clearly marked "Confidential"; and

d.    *Covenant Not to Use Proprietary Information.* Contractor shall not use the Proprietary Information: **(a)** to provide any services to or on behalf of any person or entity, either as an independent contractor, consultant or employee; or **(b)** to engage or become interested (as owner, stockholder, partner, director, officer, consultant, member or creditor) in any business or operation directly or indirectly competitive to N2 Packaging.

e.    *Proprietary Information Property of N2 Packaging.* Proprietary Information provided to Contractor and all documents and things prepared by Contractor in the course of Contractor's business relationship with N2 Packaging, including but not necessarily limited to correspondence, manuals, letters, notes, lists, reports,

flowcharts, computer programs, proposals, notebooks, planners, calendars, schedules, disks, data tapes, financial plans and information, business plans, and other documents and records, whether in hard copy, magnetic media, electronic, or otherwise, and any and all copies thereof, are the exclusive property of N2 Packaging and shall be returned immediately to N2 Packaging upon termination of this Agreement or upon N2 Packaging's request at any time; and

f.    *Remedies*. With respect to Contractor's foregoing covenants, any remedies at law will be inadequate in the event of a breach of any such provision, and N2 Packaging shall be entitled to the equitable remedy of specific performance and will have the right to a temporary restraining order, and preliminary and permanent injunctive relief to secure specific performance and to prevent a breach, a contemplated breach, an existing breach and a continuing breach thereof. The amount of the bond required for any such equitable relief shall be an amount of One Thousand and 00/100 Dollars ($1,000.00), which bond amount is sufficient to protect Contractor's interests.

3.    **Assignment**.  This Agreement may not be assigned or transferred by either party, whether by operation of law or otherwise, without the prior written consent of the other party.

4.    **Successors and Assigns**.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and permitted assigns.

5.    **Waiver**.  No waiver by either party of any default, right or remedy shall be effective unless in writing, nor shall any such waiver operate as a waiver of any other or of the same default, right or remedy on a future occasion.

6.    **Jurisdiction and Venue**. Any and all claims, questions or disputes regarding the interpretation, performance and enforceability of this Agreement, the rights and remedies of the parties hereunder, and all related actions or counterclaims shall be initiated and prosecuted in the courts of the state of Arizona located in Phoenix, Maricopa County, Arizona. The parties agree to submit to the jurisdiction and venue of said courts.

7.    **Governing Law; Severability**. This Agreement shall be construed and enforced in accordance with the laws of the state of Arizona, without regard to its choice of law provisions.  If any term, condition, covenant or provision of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof, and there shall be, to the extent possible, substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

8.    **Subject Matter of Agreement; Waiver of Defense of Illegality**. The subject matter of this Agreement is N2 Packaging and Contractor contracting for Contractor to market, promote and facilitate in the state of Oregon the licensure of the Proprietary Process, the sale of packaging equipment and packaging materials of the Packaging Process and customer service to licensees of the Proprietary Process. N2 Packaging and Contractor expressly, knowingly and

voluntarily waive any and all defenses to the enforceability of this Agreement based upon illegality, to include without limitation: (a) any defense that the subject matter of this Agreement is illegal under any federal, state, or local law or regulation; (b) any defense that the subject matter of this Agreement is contrary public policy; and (c) any defense that the subject matter of this Agreement involves, includes, implicates, entails or otherwise concerns illegal activities under any federal, state, or local law or regulation.

9. **Attorney Fees**. In the event it becomes necessary for either party to this Agreement to institute a suit at law or in equity for the purposes of enforcing any of the provisions of this Agreement, the prevailing or successful party shall be entitled to recover said party's reasonable attorney fees, plus court costs and expenses, from the non-prevailing or unsuccessful party.

10. **Survival of Certain Covenants**. Notwithstanding the termination of this Agreement and anything to the contrary in this Agreement, the terms, provisions and covenants of Section 4 of this Agreement shall survive the termination of this Agreement.

11. **Entire Agreement, Amendment**. This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements, written and oral, between the parties. No modification of any of the terms of this Agreement shall be deemed to be valid unless it is in writing and signed by both parties. No course of dealing or usage of trade shall be used to modify the terms and conditions herein.

12. **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which counterpart, when so executed and delivered, shall be deemed to be an original, and all of which counterparts, taken together, shall constitute one and the same instrument. Distributor and Processor further agree that facsimile signatures by the parties shall be binding to the same extent as original signatures.

| "N2 Packaging" N2 PACKAGING SYSTEMS, LLC, an Arizona limited liability company | "Contractor" |
|---|---|
| By: _____ | _____ Alejo Abellán |
| Its: _____3/28/17____ | Dated: March 27th 2017 |
| Dated: _____ | |

Independent Contractor Agreement, Page -5-

# **EXHIBIT J**

# PACKAGING SUPPLY AGREEMENT

### Standard Seamer/Inerter System
### 25-30 Cans Per Minute

This Packaging Supply Agreement, dated _June 27_, 2017 (the "Effective Date"), is by and between N2 Packaging Systems, LLC, an Arizona limited liability company ("**N2 Packaging**"), _Chakra Cauwable Crp_ and its Affiliates ("**Processor**").

RECITALS:

WHEREAS, N2 Packaging provides a Packaging Process, packaging materials and packaging equipment, that utilizes N2 Packaging's Proprietary Process; and

WHEREAS, Processor desires to utilize in its business operations N2 Packaging's Packaging Process that utilizes the Proprietary Process, including the purchase of packaging materials; and

WHEREAS, N2 Packaging is agreeable to provide to Processor its Packaging Process that utilizes its Proprietary Process, including the sale of packaging materials to Processor, pursuant to and in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual promises and covenants set forth below, N2 Packaging and Processor mutually agree as follows.

1. **Definitions**.

   1. *Affiliates*: any entity that controls, is controlled by or is under common control with another entity, including the owners of any such entity. An entity is deemed to be in control of another entity (controlled entity) if the former owns directly or indirectly more than fifty percent (50%) of the outstanding voting equity of the controlled entity (or other equity or ownership interest if such entity is other than a corporation).

   2. *Agreement*: this Agreement, as it may be amended, including all attachments, exhibits and addenda attached hereto.

   3. *Commencement Date*: the date of delivery of the packaging equipment as set forth in Section 10 hereof.

   4. *Confidential Information*: the existence and terms of this Agreement and N2 Packaging's Proprietary Process, and all information disclosed, whether orally or in writing, by one party to the other under this Agreement, and as otherwise identified or designated as "CONFIDENTIAL" at the time of disclosure, with oral

disclosures being summarized in writing and provided to the other party within thirty (30) days after disclosure.

5.    *Effective Date*: the date of this Agreement provided above.

6.    *Packaging Process*: the use of the Proprietary Process to seal hermetically Product in a can for distribution and sale to consumers as described in Patent No. US 8,863,947 B2 issued October 21, 2014.

7.    *Product*:  Products using or otherwise involving the Proprietary Process.

8.    *Proprietary Process*: N2 Packaging's patented proprietary process (described in that certain patent issued: Patent No. US 8,863,947 B2 issued October 21, 2014), including, without limitation, any and all modifications, betterments and advancements to said proprietary process, whether or not patentable.

9.    *Third Party*: any individual, corporation, partnership, trust or other business organization or entity, governmental entity, and any other recognized organization other than the parties hereto and their Affiliates.

2.    **Licensing Fee and Use of Packaging Process**. Subject to, and in accordance with, the terms and conditions of this Agreement, and in consideration of a one-time licensing, set-up and training fee of Five Thousand and 00/100 Dollars ($5,000.00).  N2 Packaging shall provide to Processor its Packaging Process that utilizes the Proprietary Process on a non-exclusive, revocable license basis, together with the sale of packaging materials in the herein provided minimum required quantities. Processor shall utilize N2 Packaging's Packaging Process that utilizes the Proprietary Process with the provided packaging equipment, on a non- exclusive, revocable license basis solely for Product, together with the purchase of packaging materials from N2 Packaging. N2 Packaging shall have the right to revoke immediately the license to use the Proprietary Process upon breach by Processor of the terms of this Agreement. Processor shall pay the initial annual licensing fee on the Effective Date of this Agreement, and thereafter on the anniversary of the Commencement Date continuing with the renewal of this Agreement as provided in Section 3 hereof. Further, the labeling of Processor's packaged Product shall include N2 Packaging's logo utilizing N2 Packaging's label template.

Processor acknowledges the quality of the Product is material to N2 Packaging's grant to Processor of the license to use, and Processor's use of, the Packaging Process that utilizes the Proprietary Process. Accordingly, Processor shall observe, follow and conform to the N2 Packaging Requirements for Use and Quality Control Specification set forth at Attachment B hereof.

3.    **Term**. This Agreement shall be for a term of twelve (12) consecutive months, commencing on the Commencement Date, and shall automatically renew for successive

terms of twelve (12) consecutive months until either party gives not less than ninety (90) days written notice of termination to be effective at the end of any such term.

4.    **Packaging Materials**.  The packaging materials consist of the following:

- Metal Food Grade Can
- Metal Pull Top Safety Lid
- Plastic Lid (non CR)
- Shipping

5.    **Packaging Material Purchase Price; Price Discount**. N2 Packaging shall sell to Processor, and Processor shall purchase from N2 Packaging:

➢ The foregoing described packaging materials in 211x101.5 commonly referred to as "(⅛) ounce" size can.  Pallet increments of 14,400 cans, for the amount of Fourteen Thousand Four Hundred and 00/100 Dollars ($14,400.00) ($1.00 per one-eighth (⅛) ounce size can); and

➢ The foregoing described packaging materials in 211x108 commonly referred to as "Big Bud Cans" cans. Pallet increments of 22,464 for the amount of Twenty-Three Thousand Five Hundred Eighty-Seven and 20/100 Dollars ($23,587.20) ($1.05 per can); and

➢ The foregoing described packaging materials in 211x114.5 commonly referred to as "Edible & Bud Cans" "(¼) ounce" size can, in pallet increments of 16,146 cans, for the amount of Seventeen Thousand Seven Hundred Sixty and 60/100 Dollars ($17,760.60) ($1.10 per one-quarter (¼) ounce size can).

As and for an inducement to Processor to exceed, on an annualized basis, the Bi-Monthly Minimum Requirement as provided in Section 6 hereof, Processor shall receive: **(i)** a five percent (5%) discount of the foregoing provided purchase price for thirteen (13) to twenty four (24) pallets of the packaging materials ordered during the twelve (12) months period commencing from the Commencement Date and each anniversary of the Commencement Date; and **(ii)** a ten percent (10%) discount of the foregoing provided purchase price for twenty five (25) or more pallets of the packaging materials ordered during the twelve (12) months period commencing from the Commencement Date and each anniversary of the Commencement Date.

Processor shall pay in full the purchase price of said packaging material within fourteen (14) days of initial order date.

6.    **Monthly Minimum Requirements of Packaging Materials.**    Processor shall order not less than ten (10) pallets during a term of this Agreement (the "Annual Minimum Requirement") as follows: one (1) pallet of packaging materials every two (2) months during the term of this Agreement (the "Bi-Monthly Minimum Requirement").

Processor's orders of said packaging materials in excess of the Bi-Monthly Minimum Requirement shall be in pallet increments.

7.  **Packaging Equipment Provided**. So long as Processor satisfies the Bi-Monthly Minimum Requirement, N2 Packaging will provide a standard "25-30 cans per minute" Seamer and Nitrogen Inerter for use by Processor as part of this Agreement. If Processor fails to satisfy the Bi-Monthly Minimum Requirement, Processor shall pay to N2 Packaging Two Thousand and 00/100 Dollars ($2,000.00) for each bi- monthly period it fails to satisfy the Bi-Monthly Minimum Requirement for the possession and use of said standard "25-30 cans per minute" Seamer and Nitrogen Inerter. Amount to be credited if minimum pallet requirement is met.  N2 Packaging shall and does retain the ownership of the said standard "25-30 cans per minute" Seamer and Nitrogen Inerter. Processor shall maintain the said standard "25-30 cans per minute" Seamer and Nitrogen Inerter in good operating condition and state of repair, normal wear and tear excepted. Upon termination of this Agreement Processor will return the said standard "25-30 cans per minute" Seamer and Nitrogen Inerter in good operating condition and state of repair, normal wear and tear excepted. Processor shall purchase all other packaging equipment from N2 Packaging as provided in Section 9, hereof.

8.  **Packaging Materials Pricing Changes**. The purchase price for the respective sizes of the packaging materials shall be subject to adjustment by N2 Packaging giving not less than one hundred twenty (120) days written notice; provided, however, any such adjustment shall be neither in excess of ten percent (10%) nor more frequent than any six (6) month period during a term of this Agreement. The pricing of the respective sizes of the packaging materials and the Bi-Monthly Minimum Requirement shall be subject to negotiation at any renewal of this Agreement.

9.  **Purchase of Other Packaging Equipment**. Except the standard "25-30 cans per minute" Mini-Seamer and Nitrogen Inerter provided to Processor as set forth in Section 7 hereof, N2 Packaging shall sell to Processor, and Processor shall purchase from N2 Packaging, the packaging equipment listed and priced in Attachment A hereof.

10. **Delivery and Installation of Packaging Equipment; Instruction and Training**. N2 Packaging shall deliver to Processor and install, on or before _____, the packaging equipment at the following location: (the "Delivery Location"). Processor shall provide, at the Delivery Location, the building, physical facilities, any and all governmental permits and approvals, power source and supply, equipment and apparatus, and all such other provisions appropriate, required and necessary to and for the placement, installation and operation of the packaging equipment at the Delivery Location. N2 Packaging shall provide to Processor up to 3 days (24 hours total) of instruction and training in the operation and maintenance of the packaging equipment.

1.  *Maintenance, Service and Repair of "25-30 cans per minute" Mini-Seamer and Nitrogen Inerter*. Processor shall comply with the Servicing and Maintenance agreement set forth at Attachment C hereof.

2.  *Maintenance, Service and Repair of other Packaging Equipment.* Warranties for the packaging equipment shall come solely from and through the manufacturer of the packaging equipment. N2 Packaging does not make, and expressly disclaims, any and all warranties and representations of and pertaining to the packaging equipment. Processor shall be responsible for and perform, at its sole cost and expense, all maintenance, service, and repair to maintain and keep the packaging equipment in good operating condition and repair (the "Routine Maintenance").

3.  *Packaging Equipment Parts and Component Inventory*. To facilitate and further Processor's performance of the Routine Maintenance, N2 Packaging shall provide the listing, and the inventory, of parts and components of and to the packaging equipment, including for the standard "25-30 cans per minute" Mini-Seamer and Nitrogen Inerter, necessary for the operation and the Routine Maintenance of the packaging equipment. After the initial delivery of said inventory of parts and components, Processor shall maintain, at its cost and expense, the said inventory of the parts and components.

4.  *Operation of Packaging Equipment*. Subject only to the foregoing Sections 10.1, 10.2, and 10.3, Processor shall operate the packaging equipment at its sole cost and expense and risk; and shall bear the entire risk of loss, theft, damage and destruction of the packaging equipment, including for the standard "25-30 cans per minute" Mini-Seamer and Nitrogen Inerter, from any cause whatsoever, and no loss, theft, damage or destruction of the packaging equipment shall relieve Processor of its obligations under this Agreement. In the event of any loss or destruction of the Mini-Seamer and/or the Nitrogen Inerter provided to Processor as set forth in Section 7 hereof, Processor shall pay to N2 Packaging Forty-Two Thousand and 00/100 Dollars ($42,000.00) for the Seamer and Twenty-Four Thousand and 00/100 Dollars ($24,000) for the Nitrogen Inerter. Processor shall be solely responsible for compliance with any and all federal, state, and local law and regulation pertaining and associated to the operation and use of the packaging equipment, inclusive of the standard "25-30 cans per minute" Mini- Seamer and Nitrogen Inerter. Processor shall further bear all risk that the packaging equipment may become unusable for any reason, including, not by way of limitation, any federal, state, and local law and regulation.

11.  **Exclusivity**. During the term of this Agreement, Processor: **(i)** shall not utilize a packaging line of any type to package Product utilizing N2 Packaging's Packaging Process; and **(ii)** shall not utilize N2 Packaging's Proprietary Process or the packaging equipment, inclusive of the standard "25-30 cans per minute" Mini-Seamer and Nitrogen Inerter, for any purpose or reason other than to package its Product.  N2 Packaging, at its

sole cost, shall have the right to audit and inspect the Processor's facilities for the purpose of verifying Processor's adherence to the foregoing and compliance with this Agreement. N2 Packaging shall have the right to terminate this Agreement immediately upon breach by Processor of the terms of this Agreement, and specifically this Section, and may seek injunctive relief upon any violation or threatened violation of the terms of this Section, in addition to all other rights and remedies available at law or in equity, without having to post a bond or other security. Upon the expiration or termination of this Agreement, the license to utilize N2 Packaging's Proprietary Process shall immediately cease, without the necessity of notice or affirmative action by N2 Packaging.

12. **Ownership of Proprietary Process; Confidentiality**.

    1. *Proprietary Process*. N2 Packaging owns the Proprietary Process, including all applicable patent(s). Processor shall have no right, title or interest in or to the Proprietary Process, except the limited license to utilize the Proprietary Process pursuant to and in accordance with this Agreement. Processor shall have no rights under any technology rights, whether patentable or not, or any patents, patent applications, trade secrets or other proprietary rights of N2 Packaging. Processor shall not modify or otherwise reverse engineer the Proprietary Process; and shall not seek any intellectual property protection, including, without limitation, any patent relating to or otherwise directed to the manufacture or use of the Proprietary Process in conjunction or in combination with any other product or process utilizing, employing or otherwise applying the Proprietary Process or any portion or derivations thereof. Processor shall execute such documentation and take other steps requested by N2 Packaging to maintain, establish and protect N2 Packaging's ownership interests in the Proprietary Process, and Processor shall not take any actions inconsistent with such ownership by N2 Packaging. N2 Packaging shall have the right to terminate this Agreement immediately upon breach by Processor of the terms of this Agreement, and specifically this Section, and may seek injunctive relief upon any violation or threatened violation of the terms of this Section, in addition to all other rights and remedies available at law or in equity, without having to post a bond or other security.

    2. *Mutual Confidentiality; Required Disclosure by Law*. The Confidential Information received by a party (the "**Receiving Party**") from the other party (the "**Disclosing Party**") shall not be disclosed by the Receiving Party to any Third Party without the express written consent of the Disclosing Party; and shall not be used by the Receiving Party for purposes other than those contemplated by this Agreement. Disclosure of a Disclosing Party's Confidential Information is limited to the individuals of N2 Packaging and its Affiliates, and of Processor and its Affiliates, who have a need to know and are subject to the terms of confidentiality of this Agreement. If, in the opinion of a party's counsel, any of a Disclosing Party's Confidential Information is required to be disclosed pursuant to

law, regulation, or court order, the Receiving Party shall give the Disclosing Party prompt written notice in order to allow the Disclosing Party to take whatever action it deems necessary to protect its Confidential Information. In the event that no protective order or other remedy is obtained, or the Disclosing Party waives compliance with the terms of this Agreement, the Receiving Party will furnish only that portion of the Confidential Information that its counsel advises is legally required, and any such disclosure under this Section shall not be a violation of this Agreement. N2 Packaging and Processor hereby acknowledge and affirm that certain confidentiality agreement to which they are parties (the "Existing Confidentiality Agreement"). The terms, provisions and covenants of the Existing Confidentiality Agreement are hereby incorporated into this Agreement, by reference. In the event of any conflict or ambiguity between this Agreement and the Existing Confidentiality Agreement, the terms, provisions and covenants providing the most protection of confidentiality to the Disclosing Party shall govern and control.

3. *Standard of Care*. Each party shall exercise the same care and measures to protect the Confidential Information of the other party as it uses to protect its own confidential information and trade secrets, provided, however, that in no event will the measures taken be less than reasonable.

13. **Failure of Performance**. Failure of N2 Packaging to deliver, or Processor to take delivery of, the packaging materials in accordance with this Agreement shall not be deemed a default, and shall not subject N2 Packaging or Processor to any liability to the other party, if: **(i)** such failure is caused by any act of God; or **(ii)** is attributable to the other party; **(iii)** or is caused by any other circumstance beyond the reasonable control of N2 Packaging or Processor; or **(iv)** by the interruption of or delay in transportation, production failure, or inadequacy or failure of material, equipment or breakdown; or **(v)** act(s) of terrorism; or **(vi)** labor trouble (whether or not rising to the level of a strike) or **(vii)** vendor supply delays, or raw materials or packaging shortages; or **(viii)** violation or compliance with any governmental action, laws, regulations, requests or restrictions of any jurisdiction or agency thereof (each, an "**Event of Force Majeure**"), whether such circumstances now exist or hereafter arise. The party whose performance is prevented shall use reasonably diligent efforts to cure such failure to the extent such failure may be cured. If either party claims an Event of Force Majeure, it shall immediately notify the other party in writing at the commencement and termination of such claim.

14. **Product Warranty**. N2 Packaging warrants to Processor only that the packaging materials will be suitable for the packaging of the Product. In the event of N2 Packaging's breach of this warranty, N2 Packaging shall, at Processor's option: **(i)** replace the defective packaging materials and ship the replacement packaging materials to Processor at N2 Packaging's expense; or **(ii)** refund the amount paid by Processor for the defective packaging materials to Processor.  The exercise of one of these two

remedies shall be Processor's sole remedy for N2 Packaging's breach of warranty. N2 Packaging makes no other warranties, express or implied, of any other type or nature, including, not by way of limitation, warranties of merchantability or fitness for a particular purpose, except as expressly provided herein.

**IN NO EVENT WILL N2 PACKAGING BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING FROM A BREACH OF WARRANTY INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, RENTAL, PURCHASE OF REPLACEMENT PRODUCT, OR OTHER COMMERCIAL LOSS.**

15.   **Representations of Processor; Indemnity by Processor**. Processor represents and warrants to N2 Packaging that Processor has secured from applicable governmental jurisdictions, and possesses and shall maintain in good standing during the term of this Agreement and any renewal thereof, any and all licenses, permits, authorizations and approvals necessary or required for the operation of Processor's business. Processor shall indemnify, defend, and hold N2 Packaging and its members, employees, agents, representatives, and Affiliates harmless from and against any and all Third Party claims, causes of action, criminal charges or indictments, judgments and/or settlement costs, other costs and expenses (including, but not limited to, reasonable attorney fees and expenses), losses, or liabilities of any kind (collectively, "**Liabilities**") arising out of or resulting from any of the following: **(i)** Processor's business activities, negligence or willful misconduct; **(ii)** any theory of strict liability in tort with regard to the Product or any other product of Processor, or Processors manufacturing processes, shipment practices or processes, and distribution of the Product or any other product of Processor; **(iii)** any infringement or alleged infringement of any patent, trademark, or other proprietary right of a Third Party regarding the Product, or Processor's manufacturing processes, shipment practices or processes, and distribution of the Product or any other product of Processor; and **(iv)** any injury or death of persons or injury to property arising from use of the Product, Processor's manufacturing processes, shipment practices or processes, and distribution of the Product or any other product of Processor. Processor shall maintain during, and for a period of one year after, the term of this Agreement insurance coverage with N2 Packaging named as an additional insured party, to protect against liability, including product liability, that may arise out of or relate to the Product, Processor's business activities, to include, not by way of limitation, Processor's manufacturing processes, shipment practices or processes, and distribution of the Product or any other product of Processor, and any injury or death of persons or injury to property arising from use of the Product, Processor's manufacturing processes, shipment practices or processes, and distribution of the Product or any other product of Processor in minimum limits of $1,000,000. Processor shall deliver to N2 Packaging a certificate of insurance demonstrating the existence of such insurance coverage.

16. **Notices**. Any notice, or other communication required or permitted to be given under this Agreement ("**Notices**") shall be in writing and shall be: **(i)** personally delivered, **(ii)** delivered by a reputable overnight courier, or **(iii)** delivered by certified mail, return receipt requested, and deposited in the United States mail, postage prepaid. Notices shall be deemed received at the earlier of actual receipt or **(1)** one business day after deposit with an overnight courier as evidenced by a receipt of deposit; or **(2)** three business days following deposit in the United States mail, as evidenced by a return receipt. Notices shall be directed to the parties at their respective addresses shown below, or such other address as either party may, from time to time, specify in writing to the other in the manner described above:

> N2 Packaging: N2 Packaging Systems, LLC
> 551 Addison Ave. W.
> Twin Falls, ID 83301
>
> Processor:  CHAKRA CANNABIS CORP.
> 4570 Blowkinsop Rd.
> Victoria BC.
> V8X3C5

17. **Relationship of Parties**. The relationship of the parties under this Agreement is that of independent contractors. Nothing contained in this Agreement is intended or is to be construed so as to constitute the parties as partners, joint venturers, or either party as an agent or employee of the other party. Neither party has any express or implied right under this Agreement to assume or create any obligation on behalf of or in the name of the other party, or to bind the other party to any contract, agreement or undertaking with any Third Party, nor shall no conduct of the parties be deemed to infer such right.

18. **Assignment**. This Agreement may not be assigned or transferred by either party, whether by operation of law or otherwise, without the prior written consent of the other party.

19. **Successors and Assigns**. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and permitted assigns.

20. **Waiver**. No waiver by either party of any default, right or remedy shall be effective unless in writing, nor shall any such waiver operate as a waiver of any other or of the same default, right or remedy on a future occasion.

21. **Jurisdiction and Venue**. Any and all claims, questions or disputes regarding the interpretation, performance and enforceability of this Agreement, the rights and remedies of the parties hereunder, and all related actions or counterclaims shall be initiated and prosecuted in the courts of the state of Arizona located in Phoenix, Maricopa County, Arizona. The parties agree to submit to the jurisdiction and venue of said courts.

22.   **Governing Law**. This Agreement shall be construed and enforced in accordance with the laws of the state of Arizona, without regard to its choice of law provisions.

23.   **Subject Matter of Agreement; Waiver of Defense of Illegality**. The subject matter of this Agreement is N2 Packaging and Processor contracting for N2 Packaging to provide to Processor its Packaging Process that utilizes N2 Packaging's Proprietary Process together with N2 Packaging's sale of packaging materials to Processor. N2 Packaging and Processor expressly, knowingly and voluntarily waive any and all defenses to the enforceability of this Agreement based upon illegality, to include without limitation: **(i)** any defense that the subject matter of this Agreement is illegal under any federal, state, or local law or regulation; **(ii)** any defense that the subject matter of this Agreement is contrary public policy; and **(iii)** any defense that the subject matter of this Agreement involves, includes, implicates, entails or otherwise concerns illegal activities under any federal, state, or local law or regulation.

24.   **Attorney Fees and Costs**. In the event any party to the Agreement is required to institute legal proceedings to enforce the terms of this Agreement, the prevailing party in such legal proceeding shall be entitled to an award of all reasonable attorney fees and costs incurred at all stages of such legal proceeding, including any appeal therefrom.

25.   **Survival of Certain Covenants**. Notwithstanding the termination or expiration of this Agreement and anything to the contrary in this Agreement, the terms, provisions and covenants of Section 12 of this Agreement shall survive the termination or expiration of this Agreement.

26.   **Severability**. If any term or provision of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof, and there shall be, to the extent possible, substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

27.   **Entire Agreement, Amendment**. This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements, written and oral, between the parties. No modification of any of the terms of this Agreement shall be deemed to be valid unless it is in writing and signed by both parties. No course of dealing or usage of trade shall be used to modify the terms and conditions herein.

28.   **Counterparts; Facsimile Signatures**. This Agreement may be executed in any number of counterparts, each of which counterpart, when so executed and delivered, shall be deemed to be an original, and all of which counterparts, taken together, shall constitute one and the same instrument. N2 Packaging and Processor further agree that facsimile signatures by the parties shall be binding to the same extent as original signatures.

| "N2 Packaging" | "Processor" |
|---|---|
| N2 PACKAGING SYSTEMS, LLC | ChAKRA CANNAbis Corp. |
| By: _____ | By: _ChAirMAN of Board._ |
| Its: _____ CEO | Its: _____ |
| By: _____ | |
| Its: _____ | |

## Attachment A

## Supplied by Green Tech Innovations, LLC

### Suggested Equipment

Label applicator / Table Top Model

Suggested Manufacturer /

Acccutek- Aaron Carpenter - 760-734-4177

Precision Automation

(Contact Frank Jablonski @ Precision Automation to
purchase direct and mention N2 Packaging for preferred
customer discount. Office (435) 657-6237 Cell
(856)-296-8241 or frankj@precisionautomationinc.com)

### Additional Options Below

| | |
|---|---|
| Stainless Steel Table (72"x30") | $500.00 |
| Stainless Steel Table (48"x30") | $400.00 |
| Stainless Steel Table (36"x30") | $380.00 |
| Rotary Accumulation Table (48" table) | $4,550.00 |
| Warranty from manufacturer | |
| Shipping and Packaging costs to be paid by Processor | TBD |

## Attachment B

## N2 Packaging Requirements for Use and Quality Control Specification

- Fully comprehensive lab testing on each crop that is to be packaged into N2 (THC & Cannabinoid levels, pesticide, mold, mildew, fungi, and any foreign containments) samples should be random batch samples taken from each strain and each growing environment ex. (greenhouse, flower room, field, etc.) If samples of same strain are taken from different environments, then average of THC level is adequate

- Only highest quality top/choice buds/flowers should be used with N2 packaging, no bottom flowers or anything that is not fully developed/mature (N2 will control thru S.T.A.T.S.)

- No machined wet-trimmed product should be used with N2 packaging, and hand-trimmed is recommended method. Use of a no tumble dry-trimmer to process product can be assessed on a case by case basis

- Moisture levels of any cannabis flower place into N2 packaging should be between 8-12% and never >15% to avoid mold, mildew, and fungi growth, we recommend moisture levels no <8% and no >10% to avoid an over dried/moist product

- N2 packaging must be done in room separate from all other cultivation/processing/ extraction areas with proper filtration which is free of any airborne containments

- No use of banned PGR's, chemical spray pesticides, foliar flower enhancers, or any chemical spray applications on any flowering plants to be used with N2 packaging

- No use whatsoever of any spray or additive to enhance product potency, taste, and smell after week 2 of flower or on harvested flower product

- Hairnets, beard-nets, masks and gloves should be worn by all employees from trimming to processing and packaging to avoid contamination

- The final packaged product should be stored in a cool and secure location prior to distribution

## Attachment C

## Servicing and Maintenance Agreement

# <u>EXHIBIT K</u>

Chakra Cannabis

(https://chakracannabis.com/)

CANNABIS    LIVE RESIN    FOUNDER    TOUR    CONTACT (https://chakracar

(https://chakracannabis.com)

© CHAKRA CANNABIS 2019

(http://www.cloudlineagency.com)

Chakra Cannabis



[(https://chakracannabis.com/)](https://chakracannabis.com/)

CANNABIS    LIVE RESIN    ⁄    FOUNDER    ⁄    TOUR    ⁄    CONTACT    (https://chakracar





# CHAKRA CANNABIS

### Organic Gardens

### Shamanic Intent

### Sun Grown

[(https://chakracannabis.com)](https://chakracannabis.com)

© CHAKRA CANNABIS 2019

 [(http://www.cloudlineagency.com)](http://www.cloudlineagency.com)

*Feed the soul.*

# CHAKRA STRAINS



[(https://chakracannabis.com/)](https://chakracannabis.com/)

Ground yourself and open your mind – Cannabis has been used to enhance the spiritual experience since the dawn of awakening.

Chakra Cannabis is organically sun grown and embedded with Shamanic intent, invisible to the naked eye but no less real than a heartbeat.  Our strains are focused on 7 spiritual nodes called the Chakras.

Through moderation and healthy lifestyle, Chakra Cannabis is about balancing unified mind, body and spirit collectively… creating pure existence.

CHAKRA STRAINS





CANNABIS     LIVE RESIN     FOUNDER     TOUR     CONTACT     (https://chakracar



[(https://chakrac](https://chakrac)

© CHAKRA CANNABIS 2019

  [(http://www.cloudlineagency.com)](http://www.cloudlineagency.com)



# OUR STRAINS

 

(https://chakracannabis.com/)

CANNABIS     LIVE RESIN     FOUNDER     TOUR     CONTACT (https://chakracar



  

  

(https://chakracannabis.com)

© CHAKRA CANNABIS 2019

(http://www.cloudlineagency.com)



(https://chakracannabis.com/)




CANNABIS    LIVE RESIN    FOUNDER    TOUR    CONTACT (https://chakracar



# LIVE RESIN - BC ORGANIC

*Created with love from our organic cannabis.*

(https://chakracannabis.com)





[(https://chakracannabis.com/)](https://chakracannabis.com/)

CANNABIS    LIVE RESIN    FOUNDER    TOUR    CONTACT [(https://chakracar](https://chakracar)

## CRITICAL MASS CBD
*THC 37.78% / CBD 36.45%*

## MASTER KUSH
*THC 79.70% / CBD 0.15%*

## PINEWARP
*THC 76.81% / CBD trace*

## CANNABIS & THE HUMAN BODY

*The systems of the human body each rely on the other to keep the body functioning. Cannabis can help them all both individually and to function in better harmony – holistically.*
[(https://chakracannabis.com)](https://chakracannabis.com)

© CHAKRA CANNABIS 2019

[(http://www.cloudlineagency.com)](http://www.cloudlineagency.com)

Circulatory    Digestive

Nervous      Endocrine      Respiratory

## CHAKRA CANNABIS

(https://chakracannabis.com/)

CANNABIS    LIVE RESIN    FOUNDER    TOUR    CONTACT (https://chakracar

Muscular      Skeletal      Excretory      Integumentary      Reproductive

## BEHIND THE MOVEMENT

*Meet Alex.*

© CHAKRA CANNABIS 2019



# FOUNDER
# ALEX ABELLAN

*Visionary Pioneer of Chakra Cannabis*

Chakra Cannabis

![CHAKRA CANNABIS](https://chakracannabis.com/)

(https://chakracannabis.com/)

CANNABIS    LIVE RESIN    FOUNDER    TOUR    CONTACT (https://chakracan





As Founder and President of Chakra Cannabis, I am dedicated to putting Canada on the world stage as a pioneer in the responsible dispensing of cannabis. After helping local compassion clubs implement risk reduction and health awareness initiatives into their business models, I felt and identified a critical need: Canadians needed a comprehensive distribution model to provide support, resources and education for members of the community who used cannabis to improve their quality of life.

In order to turn my vision into a reality, I've built relationships with experts from medical associations, law enforcement, government, research laboratories, and licensed producers from across the country to develop the Chakra Cannabis business model. Despite my position as President and Founder, it is my sincere hope that humility and passion remain the driving force behind the entire Chakra Cannabis movement today.

**"Just because it's legal, doesn't mean it's safe."**

– Alex Abellan

 (http://www.cloudlineagency.com/)

# COAST TO COAST TOUR!



*...tations all across the country, answering
...ess about the impact of legalization in our
communities!*

ORDER YOUR SHIRT!

*(mailto:order@chakracannabis.com)*



Chakra Cannabis

[(https://chakracannabis.com/)](https://chakracannabis.com/)    (http://askbeforeyoupass.com)

CANNABIS    LIVE RESIN    FOUNDER    TOUR    [(https://chakracar...](https://chakracar)

# CONNECT!

*Sharing our story unites us.*

Your Name (required)

[(https://chakracannabis.com)](https://chakracannabis.com) Your Email (required)

© CHAKRA CANNABIS 2019

Subject

 [(http://www.cloudlineagency.com)](http://www.cloudlineagency.com)

Your Message



CHAKRA CANNABIS

(https://chakracannabis.com/)



CANNABIS     LIVE RESIN     FOUNDER     TOUR     CONTACT (https://chakracar

[recaptcha]

Send

## Partners in Safe Distribution


(http://askbeforeyoupass.com)


(http://timecapsulecans.com)




(http://alexabellan.com)


(http://highcanada.net)

emerald HEALTH THERAPEUTICS
(http://emerald.care)


(https://www.nhl.com/se

© CHAKRA CANNABIS 2019

FACEBOOK      TWITTER      GOOGLE PLUS      LINKEDIN      PINTEREST

(http://www.cloudlineagency.com)






[(https://chakracannabis.com/)](https://chakracannabis.com/)

CANNABIS   LIVE RESIN   /   FOUNDER   /   TOUR   /   [(https://chakracar](https://chakracar) CONTACT

[(https://chakracannabis.com)](https://chakracannabis.com)

© CHAKRA CANNABIS 2019

 [(http://www.cloudlineagency.com)](http://www.cloudlineagency.com)